UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CHEMEON SURFACE TECHNOLOGY, LLC, | Case No. 3:15-cv-00294-MMD-VPC |
| Plaintiff, | Related Case No. 3:15-cv-00295-MMD-VPC |
| v. | ORDER |
| METALAST INTERNATIONAL, INC. *et al.*, | |
| Defendants. | |
| AND RELATED CLAIMS | |

## I.    SUMMARY

The dispute stems from the breakup of a business and disagreement over the terms of a subsequent settlement agreement. Before the Court are three motions: (1) Defendants and Counterclaimants David M. Semas ("Semas"), Metalast International, Inc. ("the Inc."), Metalast Inc. ("MI"), and Sierra Dorado, Inc.'s ("Sierra Dorado") (collectively, "Metalast Defendants") Motion for Partial Summary Judgment ("Metalast Defendants' Motion") (ECF No. 313); (2) Plaintiff Chemeon Surface Technology, LLC's ("Chemeon") Motion for Summary Judgment ("Plaintiff's Motion") (ECF No. 315); and (3) Defendant Marc Harris' Motion for Summary Judgment ("Harris' Motion") (ECF No. 331). The Court has reviewed the parties' respective responses and replies. (ECF Nos. 324, 326, 330, 337, 338, 339, 342.) The Court has also reviewed the supplemental briefs filed

by the parties in relation to the Second Amended Complaint ("SAC").[1] (ECF Nos. 354, 356.) The Court held a hearing ("the Hearing") on the relevant motions on March 16, 2018.[2] (ECF No. 368.)

For the reasons discussed herein, Metalast Defendants' Motion is granted in part and denied in part, Plaintiff's Motion is granted in part and denied in part, and Harris' Motion is granted in part and denied in part.

## II.     RELEVANT BACKGROUND

The Inc. managed Metalast International, LLC ("the LLC") when the LLC was placed into receivership in April 2013. (ECF No. 313 at ¶¶ 1, 5; ECF No. 315 at ¶¶ 6, 50.) Chemeon's predecessor, Metalast Surface Technology, LLC ("MST"), acquired the assets of the LLC in November 2013. (ECF No. 315 at ¶ 51.)

The next month, David Semas and his wife initiated a personal Chapter 11 bankruptcy proceeding. (ECF No. 313 at 3.) On July 14, 2014, MST initiated an adversary proceeding against Semas asserting ownership of the Metalast trademark. (*Id.* at 4.) Bankruptcy Judge Gregg W. Zive mediated a settlement ("the Settlement") of the dispute on January 27, 2015, in which he stated that "the Meilings have the right to use [the Metalast] mark without compensation and in the ordinary course of their business for a period not to exceed 90 days from the date of the entry of the order approving the settlement by Judge Beesley[.]" (ECF No. 314-14 at 14.) Similarly, Judge Zive stated that "[t]he Meilings agree to dismiss [the adversary proceeding] with prejudice and to waive any and all claims they have from the beginning of time and through the date of *entering of the settlement agreement* that they may have, known or unknown, anticipated or unanticipated, against [David Semas]," that the Semas's would "release the Meilings and [MST] from any claims they may have . . . from the beginning of time until the *settlement*

[1]The Court issued a minute order on December 6, 2017, ordering the parties to file "supplemental briefs in order to supplement the existing dispositive motions based solely on the new allegations in the Second Amended Complaint." (ECF No. 353.) The SAC (ECF No. 348) was filed after the motions that the Court resolves in this order.

[2]The Court issued an oral ruling granting summary judgment in favor of Defendants Wendi Semas and Greg Semas. (ECF No. 368.)

*agreement is approved*," and that the release was one "between these parties or related entities." (*Id.* at 13 (emphasis added).) On March 11, 2015, the Bankruptcy Court (Judge Beesley) entered the order approving the Settlement. (*Id.* at 2.)

On February 24, 2015, after the settlement conference but before Judge Beesley's approval of the Settlement, Semas and Harris contacted a potential investor, sending various investment and marketing materials to him. (ECF No. 343 at 9; ECF no. 326-1 at ¶ 102.) On March 25, 2015, Semas also contacted a distributor of Chemeon. (ECF No. 314-16.) Then, on June 21, 2015, Semas applied for renewal of the trademark registration of the Metalast wordmark. (ECF No. 315-3 at 103.)

Metalast Defendants seek partial summary judgment as to two issues: (1) whether certain claims are barred based on the prior settlement and release (specifically, trademark infringement,[3] breach of Semas' fiduciary duty to the LLC, breach by Semas of the LLC's operating agreement, contractual and tortious breach of the implied covenant of good faith and fair dealing based on breach of the LLC's operating agreement, conversion, conspiracy, and breach of Semas' employment contract with the LLC); and (2) whether Chemeon has any evidence that supports other claims (specifically misappropriation of trade secrets, copyright infringement, intentional interference with prospective economic advantage, unfair competition, consumer fraud, and unjust enrichment). (ECF No. 313 at 1-2.)

Plaintiff seeks summary judgment on its claims, consisting of: (1) copyright infringement against Metalast Defendants and Harris; (2) misappropriation of trade secrets against Metalast Defendants and Harris; (3) cancellation of the Metalast wordmark; (4) cancellation of the Logo Marks; (5) breach of fiduciary duty to the LLC against Semas; (6) breach of the LLC's operating agreement against Semas; (7) breach by Semas of his employment agreement with the LLC; (8) Counterclaimants' breach of contract counterclaim; and (9) Counterclaimants' specific performance counterclaim.

---

[3]Metalast Defendants made no argument about this claim in the body of their Motion and Chemeon does not address the claim. The Court therefore disregards this claim for purposes of resolving Metalast Defendants' Motion.

Harris seeks summary judgment on Chemeon's claims of: (1) misappropriation of trade secrets; (2) copyright infringement; (3) intentional interference with prospective economic advantage; and (4) unfair competition.

**III.    LEGAL STANDARD**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (internal citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd v. Fritz Cos.,*

*Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (internal citation omitted). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, *NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

A party is permitted to seek partial summary judgment as to any claim or defense in a case. Fed. R. Civ. P. 56(a); *see also First Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 977 F. Supp. 1051, 1055 (S.D. Cal. 1997) (a court may grant summary adjudication as to specific issues if it will narrow the issues for trial). Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992) (citations omitted)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV.   METALAST DEFENDANTS' MOTION (ECF No. 313)

Metalast Defendants move for partial summary judgment on the basis that the release provision in the Settlement bars many of Chemeon's claims and that Chemeon has no evidence to establish the elements of certain of its other claims. The Court agrees with Metalast Defendants except as for one of Chemeon's claims (copyright infringement).

///

///

## A.    The Settlement

The parties dispute the effective date of the release provision in the Settlement. Chemeon contends that the effective date of the Settlement was the January 27, 2015, hearing before Judge Zive because Judge Zive stated the parties were "bound immediately upon the completion of [that] hearing" to the terms of the Settlement and that at that time there was a fully enforceable agreement. (ECF No. 324 a 17.) However, as to the term of the release, Judge Zive used the phrase "entering of" and "approv[al]" of the Settlement. In particular, he stated on the record that Chemeon's predecessors "waive any and all claims they have from the beginning of time and through the date of *entering of the settlement agreement* that they may have, known or unknown, anticipated or unanticipated, against [David Semas]." (ECF No. 314-14 at 13 (emphasis added).) The plain meanings of these terms favor reading the release term as becoming effective upon Judge Beesley's approval of the Settlement because Chemeon waived claims through the date the Settlement was entered. Moreover, if Judge Zive had intended the release to take effect at the time of the hearing, he would have said so, particularly since he clearly stated that he believed the agreement became binding at that time. (*Id.* at 20 ("I consider [the agreement] to be binding as of this time").) Further, Judge Zive stated that the Settlement had to be approved by the Bankruptcy Court. (*Id.* at 11.)

Chemeon also argues that Judge Zive's use of the phrase "related entities" does not extend to MI or Sierra Dorado because they did not participate in the settlement conference or have pending claims against them and further asserts that the phrase, "[a]t best, . . . may have encompassed [the Inc.] since that entity . . . was a named defendant in the bankruptcy adversary action initiated by Chemeon's owners." (ECF No. 324 at 9.) The Court disagrees. As Semas points out, the only parties to the adversary action were Chemeon's predecessor MST, Semas, and the Inc. (ECF No. 342 at 7), yet the Meilings were indisputably a part of the release (ECF No. 314-14 at 13). While the Meilings participated in the settlement conference representing MST, Semas maintained controlling interests in MI and Sierra Dorado at the time of the conference, which was

readily available information disclosed in the bankruptcy schedules. (*See* ECF No. 314-5 at 6.) Moreover, at the hearing, Chemeon admitted that these two entities were vehicles through which Semas advanced the Inc.'s business interests. Chemeon does not contend that "related entities" is ambiguous; rather it advocates for a particular reading that is far narrower than the plain language of the phrase permits. The Court therefore finds that "related entities" encompasses MI and Sierra Dorado.

In sum, the Court considers March 11, 2015, to be the effective date of the release provision in the Settlement. Thus, Chemeon's claims cannot be based on conduct that occurred on or before March 11, 2015 ("the Release Date"). The Court also finds that the release provision covers Semas and the Inc., as well as MI and Sierra Dorado.

## B.    Claims Affected by the Settlement

Metalast Defendants argue that claims for breach of Semas' employment agreement, breach of the LLC's operating agreement, contractual and tortious breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, conversion, and conspiracy are barred under the Settlement's release provision. (ECF No. 313 at 10-12.) The Court agrees that all claims identified by Metalast Defendants except for the breach of employment agreement claim[4] are covered under the Settlement's release provision.

Chemeon generally relies on alleged conduct that occurred before the dissolution of the LLC through the 2013 asset sale to support these claims. For instance, in the SAC, Plaintiff bases the breach of operating agreement, breach of implied covenant of good faith and fair dealing, and breach of fiduciary duty claims on Semas causing the LLC to pay for trademark registrations of Semas/the Inc., improperly paying excessive perquisite benefits, travel and entertainment expenses, and reimbursements using the LLC's funds. (*See* ECF No. 348 at 53-57). Chemeon's Motion similarly points to Semas spending LLC funds on trademark registrations that he owned as the basis for the claims related to

---

[4]Because Plaintiff cross-moved for summary judgment on this claim and the claim relates to purported actions occurring after the Release Date, the Court addresses the claim in the following section, *see* discussion *infra* Sec. V(E).

breach of the operating agreement and breach of fiduciary duty. *(*ECF No. 315 at 31-34.)* This alleged conduct occurred while the LLC still existed. Thus, the release provision of the Settlement bars these claims, and the Court grants summary judgment in favor of Metalast Defendants as to these claims.

Similarly, while Chemeon does not actually address Semas' contention that the conversion claim is based on acts arising before the Release Date, in the SAC Plaintiff states that the conversion claim is based on Defendants "spending [the LLC's] funds on property, such as trademark registrations, that were owned or to be owned by the Inc. or D. Semas, and improperly paying excessive perquisite benefits, large travel and entertainment expenses, and reimbursements to themselves and others with [the LLC's] funds." (ECF No. 348 at ¶ 336.) Because these events clearly arose while the LLC still existed, and thus prior to the Release Date, and because Chemeon has not met its burden in opposing summary judgment on this claim, the Court grants summary judgment in favor of Semas on Plaintiff's conversion claim.

Semas argues that the basis for Plaintiff's conspiracy claim arises from activities that necessarily arose before the sale of the LLC's assets to Chemeon. (ECF No. 313 at 12.) The SAC states that the conspiracy occurred between David Semas, the Inc., MI, Sierra Dorado, and Greg Semas[5] and that the unlawful objective included "acquiring, by registration, the Logo Marks; assigning rights in the Logo Marks first to [the Inc.] instead of the [LLC], and second from [the Inc.] to [David Semas] in his personal capacity; trademark infringement . . .; copyright infringement . . .; misappropriation of trade secrets; breach of various duties and agreements; and conversion of Chemeon property, including utilizing Chemeon property to file for a renewal of the Word Marks." (ECF No. 348 at ¶ 343.) Plaintiff admits that many of these activities occurred before the Release Date, but states that David Semas' "acts in threatening to and misappropriating trade secrets, infringing copyrights, converting Chemeon property to fraudulently renew his trademark . . . furthered the objective of the conspiracy." (ECF No. 324 at 17.)

---

[5]Greg Semas is no longer a party to this action. *See supra* n.2.

This argument, however, falls short of Plaintiff's burden in opposing summary judgment, as no evidence is specifically cited to in its opposition to support that these acts occurred after the Release Date. Plaintiff also fails to address what acts the other purported parties to the conspiracy—the Inc., MI, Sierra Dorado, Greg Semas and/or Wendi Semas—took in concert with David Semas and in furtherance of any unlawful objectives.[6] Summary judgment is therefore granted in favor of Metalast Defendants on the civil conspiracy claim.

## C. Remaining Claims

Metalast Defendants next move for summary judgment on Plaintiff's claims of misappropriation of trade secrets, copyright infringement, interference with prospective economic advantage, unfair competition, consumer fraud, and unjust enrichment against them, contending that Plaintiff fails to support these claims with any evidence. (ECF No. 313 at 13-15.) The Court finds that summary judgment should be granted in favor of Metalast Defendants as to Plaintiff's claims for intentional interference with prospective economic advantage, unfair competition, consumer fraud, and unjust enrichment.[7]

### 1. Intentional Interference with Prospective Economic Advantage

To prevail on a claim of intentional interference with prospective economic advantage, Chemeon must prove: (1) a prospective contractual relationship between Chemeon and a third party; (2) Semas knew about the relationship; (3) Semas intended to harm Chemeon by preventing the relationship; (4) the absence of privilege or

///

---

[6]It is important to note that Semas is the controlling shareholder and agent of the three corporate entities and therefore as a matter of law is unable to conspire with them to further an unlawful objective after the Release Date. *See Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983) ("Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.") No evidence is presented that Greg or Wendi Semas conspired with David Semas or his related corporate entities after the Release Date either.

[7]Plaintiff cross-moves for summary judgment on its claims of misappropriation of trade secrets and copyright infringement against Metalast Defendants. (ECF No. 315 at 37.) The Court will therefore address those claims in the following section. *See* discussion *infra* Sec. V.

justification by Semas and his related entities; and (5) Chemeon suffered actual harm as a result of Semas' actions. *See Wichinsky v. Mosa*, 847 P.2d 727, 729-30 (Nev. 1993).

Semas contends that Plaintiff has failed to specify what relationships or potential contracts he interfered with as between Chemeon and its suppliers or distributors. (ECF No. 313 at 14.) While Chemeon's opposition does not actually address the elements of this tort or provide specific evidence to demonstrate a genuine issue of material fact as to the elements of this claim (*see* ECF No. 324 at 15-16), Chemeon's Motion, which it incorporates by reference into its opposition (*see* ECF No. 324 at 15 n.15), identifies a March 25, 2015, email from Semas to one of Chemeon's distributors about "re-establishing a business relationship." (ECF No. 315 at ¶ 90.) Semas does not object to the admission of the email as an exhibit[8] but identifies the email as an attempt to sell the Metalast brand and related trademarks to the distributor, not to interfere with any contract between Chemeon and the distributor. (ECF No. 326-1 at ¶ 90.) Similarly, in Chemeon's Motion it states that in a May 2015 press release, Semas asserted that he was "presently conducting discussions with several prominent chemical companies and other industry leaders to continue offering the trusted Metalast brand of 'green' specialty chemicals to the world market." (ECF No. 315 at ¶ 95.) Semas also does not object to admission of this press release as an exhibit[9] but states that the exhibit fails to establish any element of any of Plaintiff's claims. (ECF No. 326-1 at ¶ 95.)

The Court agrees with Semas and finds that Chemeon has failed to meet its burden in opposing summary judgment on this claim. Even viewing the email and the statement

---

[8]This email was properly authenticated by Semas. (ECF No. 314 at ¶ 23 (stating that it is a true and correct copy of an email he sent to Julia Murray at Chemetall on March 25, 2015.)

[9]This document is unauthenticated. To the extent these documents may have been produced during the course of discovery, neither party met its burden in order for the Court to properly authenticate them. *See Orr*, 285 F.3d at 777 (stating that to provide adequate foundation for documents produced in discovery an affidavit must be produced stating who wrote/created the document and who produced it during discovery from someone who has personal knowledge of these things*); see also In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d at 781 (deeming documents authentic because the plaintiff had identified the documents as being produced by the parties in discovery). However, because Semas does not object to the existence of the press release or its content, the Court takes the content and existence of the release as undisputed.

in the press release in the light most favorable to Chemeon, Chemeon has failed to provide even a scintilla of evidence that Chemeon suffered any actual harm as a result of Semas' or his related entities' actions—it does not claim any prospective contract with a distributor or supplier was affected or that its prospective contracts with specific "prominent chemical companies and other industry leaders" were harmed.

The Court therefore grants summary judgment in favor of Metalast Defendants on Chemeon's intentional interference with prospective economic advantage claim.

### 2. Unfair Competition under 15 U.S.C. § 1125(a)

Semas contends that no evidence exists to prove that he or his related entities engaged in conduct in violation of 15 U.S.C. § 1125(a),[10] as Semas never offered any goods under the Chemeon brand. (ECF No. 313 at 14.) He admits that "[h]e has conducted some commerce under the Metalast brand, but only after the Settlement confirmed his right to do so." (*Id.*)

Chemeon's opposition does not actually address the unfair competition claim with any particularity. Instead, Chemeon states that Semas "made contacts with Chemeon distributors and suppliers to find interest by those companies to acquire rights to the Metalast brand (including logo and product marks and goodwill he did not own),"[11] that "Semas re-asserted his intention to use Chemeon's logo and product marks" during litigation, and then incorporates by reference the sixteen pages of "undisputed facts" in its Motion. (ECF No. 324 at 15.) Chemeon does not cite to any specific evidence to support these assertions in its opposition. In fact, the only evidence cited to regarding this claim is Defendants' answer to the FAC, Defendants' statements in response to

---

[10]15 U.S.C. § 1125(a) states in relevant part that "[a]ny person who, on or in connection with any goods . . . uses *in commerce* any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion. . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(A) (emphasis added).

[11]It is unclear what specific contacts Chemeon is referring to in this statement. To the extent Chemeon is referring to the March 25th email sent from Semas to one of Chemeon's distributors, the Court is unsure what purported "logo or product marks" or "goodwill" that Semas passed off as his own.

Chemeon's motion for preliminary injunction, and Semas' renewal of the Metalast wordmark registration. (ECF Nos. 32, 36, 115; ECF No. 315-3 at 100-108.) None of these things implicate Semas' or his related entities' false use or misrepresentation of items owned by Chemeon *in commerce*; Semas was not attempting to market or sell a good when making statements during the course of litigation or when renewing a registration with the United States Patent and Trademark Office ("USPTO"). Moreover, because Chemeon is not moving for summary judgment on this claim the Court will not sift through the facts section of its Motion in an attempt to discern what other evidence its unfair competition claim may be based on to support its opposition to summary judgment. *See Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("judges are not like pigs, hunting for truffles buried in briefs") (internal alteration omitted).

The Court therefore grants summary judgment in favor of Metalast Defendants[12] on this claim.

### 3. Consumer Fraud under Nevada Deceptive Trade Practices Act

Metalast Defendants contend that because the Settlement conferred ownership of the Metalast trademarks on Semas, he is not passing off for sale any of Chemeon's products and thus cannot be liable under the Nevada Deceptive Trade Practices Act ("NDTPA"), NRS §.598.0903 *et seq.* (ECF No. 313 at 14.) Chemeon fails to identify in its opposition any specific instances *after* the Release Date where Metalast Defendants solicited consumers for a transaction of goods. *See* NRS § 598.0915(1) (stating that a person is engaged in a deceptive trade practice if during the course of his business he "knowingly passes off goods or services for sale or lease as those of another person"). Instead Chemeon merely states that "[b]efore and after [the Release Date], David Semas made several attempts to contact companies that might be interest in controlling the Metalast trademark" and that he "made contacts with Chemeon distributors and suppliers to find interest by those companies to acquire rights to the Metalast brand (including logo

---

[12]The SAC fails to designate which Defendants Chemeon brings the unfair competition claim against.

and product marks and goodwill he did not own)." (ECF No. 324 at 15.) Regardless of Chemeon's failure to meet its burden in opposing summary judgment on this claim, the Settlement made clear that David Semas owned the Metalast wordmark; as such, it is unclear how Semas perpetuated fraud by trying to sell something he owned (or at least believed that he legally owned), and Chemeon presents no indication of what logo or product marks it, in fact, owned that Semas tried to sell to a consumer. Similarly, because Chemeon is not moving for summary judgment on this claim the Court will not sift through the facts section of Chemeon's Motion in an attempt to discern what other evidence its consumer fraud claim may be based on to support its opposition to summary judgment.

The Court therefore grants summary judgment in favor of Metalast Defendants on this claim.

### 4. Unjust Enrichment

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992) (citing *Nev. Indus. Dev. v. Benedetti*, 741 P.2d 802, 804 n.2 (Nev. 1987)). The essential elements of an unjust enrichment claim are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such a benefit; and (3) acceptance and retention by the defendant of such a benefit. *Unionamerica Mortg. & Equity Tr. v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981).

Metalast Defendants argue that no evidence shows that they "have used any of Chemeon's intellectual property" after the Release Date such that they were unjustly enriched. (ECF No. 313 at 15.) While the SAC contends that the benefit is the "past and continued use of [Chemeon's] intellectual property, including its trade secrets, the Chemeon trademarks, and logo marks and copyrights," the only evidence of this in Chemeon's opposition is Semas' purported use of Chemeon's intellectual property to renew the Metalast wordmark after the Release Date. (ECF No. 324 at 16.) However, no evidence is introduced that Chemeon actually conferred the purported benefit of use on

13

Semas or any of Metalast Defendants; rather, the Motion itself argues that one of Chemeon's employees "improperly acquired the specimens from Chemeon's database" and then gave those specimens to Semas. (ECF No. 315 at ¶ 110.) Thus, it is unclear how this factual situation implicates "unjust enrichment" as opposed to some other legal remedy; as a result, the Court grants summary judgment in favor of Metalast Defendants on this claim.

## V.    PLAINTIFF'S MOTION[13] (ECF No. 315)

Both Plaintiff and Metalast Defendants move for summary judgment on Plaintiff's claims of misappropriation of trade secrets, copyright infringement, and David Semas' breach of his employment agreement. Independently, Plaintiff moves for summary judgment on its claims of cancellation of the logo marks due to abandonment, cancellation of the Metalast wordmark due to fraudulent renewal, and Metalast Defendants' counterclaims of breach of contract and specific performance.

The Court resolves the motions and claims as follows: (1) grants summary in favor of Metalast Defendants on Chemeon's claims of misappropriation of trade secrets and breach of Semas' employment agreement with the LLC; (2) denies summary judgment as to Chemeon on Metalast Defendants' counterclaims of breach of contract and specific performance; (3) denies summary judgment as to both parties on Chemeon's claim of copyright infringement; (4) denies summary judgment as to Chemeon on its claim of cancellation of the Metalast wordmark; and (5) grants summary judgment as to Chemeon on its claim of cancellation of the Logo Marks.

### A.    Misappropriation of Trade Secrets

Both Plaintiff and Metalast Defendants move for summary judgment on Plaintiff's claim of misappropriation of trade secrets. Metalast Defendants contend that "Chemeon cannot point to any evidence that David Semas used, disclosed, or otherwise appropriated any trade secrets that Chemeon acquired through the asset purchase or by

---

[13]This section is limited to the remaining claims against Metalast Defendants. The Court incorporates the arguments in Plaintiff's Motion regarding Marc Harris in the following section addressing Harris' Motion. *See* discussion *infra* Sec. VI.

itself." (ECF No. 313 at 13.) In Chemeon's opposition, it identifies the supposed "threat of misappropriation" made by Semas during litigation[14] as the basis for liability. (ECF No. 324 at 16.) Yet, Chemeon cites to no Nevada case law supporting its contention that a supposed threat of misappropriation can form a basis for liability under the Nevada Uniform Trade Secrets Act ("UTSA"), NRS § 600A.010 *et seq.* (*See* ECF No. 315 at 26 (citing to California law and federal law[15]).)

The UTSA defines misappropriation as follows:

(a) *acquisition* of the trade secret of another by a person by improper means;

(b) *acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(c) *disclosure* or *use* of a trade secret of another without express or implied consent by a person who:

  (1) Used improper means to acquire knowledge of the trade secret;

  (2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

    (I) Derived from or through a person who had used improper means to acquire it;

    (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

  (3) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

NRS § 600A.030(2) (emphasis added). The UTSA does not cover a threat to use a trade secret.

---

[14]Chemeon is referring specifically to a March 31, 2016 hearing in this Court, where Chemeon contends "Defendants' counsel threatened to misappropriate the AA-200 trade secret." (ECF No. 315 at 27.) This appears to relate to the source of AA-200 (*id.* at ¶ 68), but the Court is unclear what Chemeon means by that.

[15]Chemeon brings this claim under Nevada law only, seeking "exemplary damages and punitive damages, unjust enrichment damages and attorneys' fees pursuant to NRS [§] 600A.040-060" and a permanent injunction. (*See* ECF No. 348 at 38-40.) Thus, to the extent Chemeon makes arguments in its Motion and reply regarding the federal Defend Trade Secrets Act, the Court will not consider them. (*See* ECF No. 315 at 26; ECF No. 343 at 6.)

Moreover, while acquisition of a trade secret through improper means is a form of misappropriation, the supposed "threat" to misappropriate the AA-200 trade secret at the March 31st hearing appears to be related to statements made by Semas's counsel about the number of vendors of product AA-200, but these statements do not even reflect the existence of a trade secret or that Semas had acquired the information through "improper means."[16] (*See* ECF No. 369-3 at 4.) Therefore, Chemeon has failed to establish the existence of factual dispute as to this purported incident of misappropriation under Nevada law.

In its own Motion, Plaintiff points to three other incidents of purported actual or threatened misappropriation of trade secrets but fails to analyze the elements required for the determination that particular information is a "trade secret." (*See* ECF No. 315 at 26-27; *see also* ECF No. 326 at 20-23.) One of these incidents occurred prior to the Release Date[17] so the Court will only consider the other two: (1) "using Chemeon's trade secret list, on March 21, 2015, Semas threatened the Meilings that he would use his knowledge concerning the maker and supplier of TCP-HF and AA-200 chemicals, and sell those to Chemeon's customers under the Metalast mark";[18] and (2) a press release disclosing to the public the identify of one of Chemeon's suppliers. (ECF No. 315 at 27.) As noted, a threat does not constitute misappropriation under the UTSA; therefore, the Court addresses only whether the press release disclosed a trade secret.

To establish misappropriation under the UTSA a plaintiff must show: "(1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or

---

[16]Semas would ostensibly know the vendors of the product AA-200 because of his prior employment with the LLC, so it is not clear Chemeon would be to show that Semas acquired this information through improper means.

[17]Specifically, the email sent in February 2015, which supposedly contained trade secrets of "profit margins, cost of goods sold, and "the Company's confidential relationship with suppliers and distributors." (ECF No. 315 at 27.) However, the actual attachments to this email are not admitted into evidence based on Chemeon's failure to properly authenticate them. *See* discussion *infra* Sec. V(B).

[18]The purported threat was in an email sent from David Semas to the Meilings. (ECF No. 315-3 at 9-11.) However, this email is not properly authenticated. While David Semas does not object to the admission of the email (ECF No. 326-1 at ¶ 84), authentication is a condition precedent to admissibility. *See* discussion *infra* Sec. V(B).

nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000). UTSA defines a trade secret as "information, including, without limitation, a . . . pattern, compilation . . . product, system, process, design . . . procedure, computer programming instruction or code" that "[d]erives independent economic value . . . from not being generally known to," or readily ascertainable to the public. NRS § 600A.030(5). The Nevada Supreme Court has found that whether corporate information is a trade secret is a "question for the finder of fact," and requires analyzing factors such as:

(1) The extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others;

(2) whether the information was confidential or secret;

(3) the extent and manner in which the employer guarded the secrecy of the information; and

(4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors.

*Frantz*, 999 P.2d at 358-59.

Here, the supposed trade secret in the press release is "the identity of one of Chemeon's suppliers." (ECF No. 315 at 27.) As support for Chemeon's supplier identity being a trade secret, Plaintiff cites to Dean Meiling's declaration in which he states that Chemeon's "customers, suppliers, product formulations, price points, [and] profit margins" are "all confidential information that represents a unique and valuable asset to Chemeon." (ECF No. 343 at 7 (citing ECF No. 14).) Stating that Chemeon believes the identities of its suppliers are "confidential information" does not make those identities a trade secret, particularly in light of the factors considered in *Frantz*. Moreover, the press release does not identify any entity as a supplier of Chemeon. The press release merely states that "many Metalast branded chemical have been approved or in many cases specified by a wide range of globally renowned manufacturers including BAE Systems, General

17

Dynamics, Honeywell, Lockheed Martin, Northrop Grumman, Pratt & Whitney, Sikorsky and others." (ECF No. 315-3 at 31.) While one of these manufacturers may be Chemeon's supplier, the press release does not specify which manufacturer is a supplier or even mention Chemeon in the sentence. Objectively, it is unreasonable to construe this as a disclosure of the identity of one of Chemeon's suppliers. The Court therefore finds that Chemeon has failed to demonstrate the existence or a factual dispute regarding the existence of a protected trade secret or misappropriation of the same.

Given Chemeon's failure to meet its burden in opposing summary judgment, the Court grants summary judgment in favor of Metalast Defendants on Chemeon's claim of misappropriation of trade secrets under the UTSA.

**B.   Copyright Infringement**

Both Plaintiff and Metalast Defendants seek summary judgment on Plaintiff's claim of copyright infringement against Metalast Defendants. (ECF No. 313 at 13; ECF No. 315 at 24-25.) Metalast Defendants argue that there is no evidence that copyright infringement occurred after the Release Date. (ECF No. 313 at 13.) Chemeon's Motion states that copyright infringement occurred when Semas distributed Chemeon's copyrighted works to Sutter and when Semas submitted specimens in his June 2015 wordmark renewal application to the USPTO. (ECF No 315 at 25.) The Court denies summary judgment and finds there is a factual dispute regarding whether infringement occurred when Semas used the specimens in support of his renewal application.

**1.   Evidentiary Issues**

In its Motion, Plaintiff states that it is undisputed that:

(1) Plaintiff filed copyright registration applications with the U.S. Copyright Office on May 18, 2015, May 28, 2015, June 1, 2015, February 15, 2016, March 17, 2017, and March 20, 2017 for which nine registrations have issued and two applications are still pending;

(2) David Semas provided marketing and investment materials to a potential investor that copied and made use of Plaintiff's copyrighted materials; and

(3) Semas used two of Chemeon's specimens that are protected by copyright when Semas applied for trademark registration renewal.

18

(ECF No. 315 at ¶¶ 99-102, 110-112.) Plaintiff then attached various exhibits in support of these "undisputed facts." However, two of the four exhibits[19] that purport to show that Semas infringed Plaintiff's copyrights—exhibits 29, 41—are not properly authenticated.

"Authentication is a condition precedent to admissibility," and unauthenticated documents cannot be considered by a court when ruling on a motion for summary judgment. *Orr*, 285 F.3d at 773. "[D]ocuments authenticated through personal knowledge must be attached to an affidavit that meets the requirements of [Rule] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Id.* at 773-74. However, a foundation for authenticity may be established by any manner permitted under Fed. R. Evid. 901(b) and 902. *See id.* at 774.

Exhibit 29 appears to be an email with various attachments. (ECF No. 369.) A printout of an e-mail may be authenticated through "affidavits from the actual authors laying the foundation that the emails are what they purport to be" or through a party's identification of the document as being produced by the parties in discovery. *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) (citing *Orr*, 285 F.3d at 777, 777 n.20). While Metalast Defendants do not object to the admission of Exhibit 29, the Court cannot admit a document that is not properly authenticated. The Court therefore does not consider this document when ruling on the copyright infringement claim against Metalast Defendants but takes as undisputed that Semas sent marketing and investment materials to Sutter. This fact, however, is irrelevant in light of the Settlement. (*See* ECF No. 326 at 10-11 (pointing out that the email embodied in Exhibit 29 was sent on February 24, 2015).)

///

---

[19]The Court takes judicial notice of Exhibit 39 (ECF No. 315-3 at 33-45), which contains printouts from the United States Copyright Office website of certain copyrights claimed by Chemeon. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities . . . and neither party disputes the authenticity of the websites or the accuracy of the information displayed therein").

The Court also takes judicial notice of Exhibit 43 (ECF No. 315-3 at 100-08), which is David Semas' application for renewal of the Metalast wordmark filed with the USPTO and two specimens attached in support of that application.

Exhibit 41 appears to be a comparison chart of "Chemeon's Copyrighted Material" and "Defendants' Use/Infringement." (ECF No. 315-3 at 87.) Chemeon's Motion itself states that Exhibit 41 is "exemplary evidence of Defendants' copyright infringement" (ECF No. 315 at ¶ 101). Metalast Defendants object that Exhibit 41 is not properly authenticated and that no foundation has been laid as to "which defendant supposedly copied the work, how, or when." (ECF No. 326-1 at ¶ 101.) The Court agrees and will not consider it in ruling on Plaintiff's Motion.

## 2. Genuine Dispute of Material Fact

To establish a claim for copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *L.A. Printex Indus., Inc., v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012). The issue with Chemeon's Motion is that, in spite of its contentions of when it applied for copyright registration, the only purported incident of infringement after the Release Date occurred on June 21, 2015, when two purported specimens of Chemeon were attached to the Metalast wordmark registration renewal with the USPTO. At that time, it appears the four copyright registrations Chemeon had applied for were "Metalast IPC LinePro," "Metalast JobPro Image," "Photographs of Metalast International, LLC" and "Metalast Systems Composite Image." (ECF No. 315-3 at 35-39.) While Chemeon attached its copyright registration applications with deposits of work and any issued certificates of registration to its supplemental brief (ECF Nos. 348-2, 348-3), Chemeon fails to point to what portion of that roughly two-hundred-page exhibit contains the certificates of registration that would demonstrate that the two specimens attached to the renewal application are exact copies of copyright-protected works of Chemeon. While it is not the job of this Court to sift through Chemeon's exhibit to try to figure out what copyrighted work has been infringed, a cursory review of the exhibit appears to establish a factual dispute as to whether the two specimens infringed Chemeon's copyrighted works, and Metalast Defendants' response suggests that a factual dispute does indeed exist. (*See* ECF No. 356 at 10-11 (stating that judgment is premature but that it intends

to challenge Chemeon's claimed authorship of the Inc.'s shipping labels).) The Court therefore denies both parties summary judgment as to this claim.

### C. Cancellation of the Logo Marks

Plaintiff argues that registration of the Logo Marks—U.S. Trademark Reg. Nos. 2091140, 2112805, 2884333 (ECF No. 348 at 43)—should be cancelled because Semas and the Inc. have abandoned the Logo Marks for the requisite three consecutive years. (ECF No. 315 at 27-29.) At the Hearing, counsel for Metalast Defendants agreed that they have abandoned the Logo Marks, which effectively conceded that summary judgment should issue in favor of Chemeon on this claim. (ECF No. 368.) The Court gave the parties until March 21, 2018, to reach a settlement as to cancellation of the Logo Marks and file a stipulation of dismissal of this claim with the Court. However, the parties were unable to reach an agreement as to the terms of that stipulation. (*See* ECF Nos. 371, 376.) Given Metalast Defendants' concession that they have abandoned the Logo Marks, the Court grants summary judgment in Chemeon's favor as to this claim.

### D. Cancellation of Metalast Wordmark

Chemeon moves for summary judgment on its claim for cancellation of the Metalast wordmark—U.S. Trademark Registration No. 2963106—arguing that because Semas misrepresented that he was currently using the wordmark the renewal was fraudulent. (ECF No. 315 at 29-31.) The Court finds that Chemeon has failed to meet its burden on summary judgment and that it has not established that it has standing to bring a claim for cancellation of the Metalast wordmark. The Court therefore denies summary judgment as to Chemeon on this claim and directs supplemental briefing on the issue of standing.

#### 1. Fraudulent Renewal

"A party may seek cancellation of a registered trademark on the basis of fraud . . . by proving a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and damages proximately resulting

from the reliance." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir.1990). Chemeon claims that Semas fraudulently renewed the Metalast wordmark because he "intentionally and falsely stated the Metalast mark was in current use by him for all of the products listed in the Registration." (ECF No. 315 at 30.) Yet, in its Motion, reply, supplemental brief, and at the Hearing, Chemeon presented no evidence of damages proximately caused by its reasonable reliance on Semas' purported misrepresentation. Moreover, Chemeon does not even aver that it reasonably relied on this misrepresentation. Instead Chemeon focuses solely on the intent and false representation elements of the test for fraudulent renewal. The Court therefore finds that Chemeon has failed to meet its burden and denies summary judgment as to the cancellation of the Metalast wordmark claim.

### 2.    Standing

"Cancellation of a registration is proper 'when (1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing.'"[20] *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (quoting *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984)); *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1228-1229 (9th Cir. 2008). To establish standing as a cancellation petitioner, Chemeon "must show a real and rational basis for [its] belief that [it] would be damaged by the registration sought to be cancelled, stemming from an actual commercial or pecuniary interest in [its] own mark." *Star-Kist,* 735 F.2d at 349.

In *Star-Kist Foods,* Star-Kist, a canner and seller of fish, acquired an unregistered United State trademark, ROSE BOWL, for canned sardines and mackerel as well as a registration for the same mark in the Philippines in late 1980. *Id.* at 347, 348. Rhodes, an

---

[20]Standing here refers to prudential or statutory standing, not constitutional standing. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co., Inc.*, 753 F.3d 1270, 1274 (Fed. Cir. 2014) (stating that the question of standing in cancellation petitions is "more appropriately viewed as interpretation[] of a statutory cause of action"). Courts have discretion to raise a prudential standing issue *sua sponte* and are not required to do so as with constitutional standing. *See City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 845-46 (9th Cir. 2009).

international merchandiser, had a United States trademark registration for ROSE BOWL, although the trademark was used on canned fruit, vegetable products, and fish such as tuna and salmon, which it had acquired in March 1981. *Id.* at 347. Rhodes petitioned to have Star-Kist's Philippines registration cancelled, and Star-Kist countersued contending that cancellation of Rhodes' U.S. trademark was proper because Rhodes had abandoned it and because one of Rhodes' predecessors had committed fraud in renewing the registration. *Id.* at 348. The appeal before the Ninth Circuit focused on whether Star-Kist had standing "to challenge the continued presence on the register of [Rhodes'] registration." *Id.* (quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1026 (C.C.P.A. 1982)). The Ninth Circuit found that Star-Kist had "established facts which showed it had a legitimate personal interest" in cancellation of Rhodes' trademark for three reasons. *Id.* at 349 (quoting *Lipton*, 670 F.2d at 1029). First, Star-Kist had applied to register ROSE BOWL in the United States, and Rhodes' trademark "impeded its own application because of a potential likelihood of confusion." *Id.* at 350. The court further stated that Star-Kist's desire for registration was a legitimate commercial interest, especially in light of Star-Kist's prior substantial sales under the trademark. Second, Rhodes' attorneys had contacted Star-Kist's customers in the Philippines stating that Rhodes was "the true owner of the ROSE BOWL trademark," which implicated a real interest given Star-Kist's business in the Philippines. *Id.* Third, the record reflected that Star-Kist had also made sales and promotion efforts under the mark, which represented a pecuniary interest in the mark. *Id.*

Chemeon's Motion does not address how it has or would be damaged by the registration renewal of the Metalast wordmark—in fact, it has no apparent interest in the wordmark because the Settlement made clear that Chemeon could not use the wordmark past June 9, 2015. (*See* ECF No. 51 at ¶ 19; *see also* ECF No. 62 at ¶ 19.) Moreover, Chemeon's position is inconsistent with its claim of no trademark infringement, as it seeks a ruling from this Court that its use of the Metalast wordmark to describe its history does not infringe Semas's ownership of the mark, stating that its limited use of the mark "is not

likely to cause confusion, mistake, or deception, or confuse the . . . public." (ECF No. 348 at ¶ 195.) Because Chemeon contends there is no likelihood of confusion and has failed to establish it has used the mark for commercial or pecuniary gain, it is unclear how it has standing to seek cancellation of the mark.

The Court therefore directs supplemental briefing from the parties as to why this claim should not be dismissed because Chemeon lacks standing to assert the claim.

### E. Breach of David Semas' Employment Agreement with the LLC

Plaintiff and Semas cross-move for summary judgment on Plaintiff's claim of breach of Semas' employment agreement with the LLC. (ECF No. 313 at 10; ECF No. 315 at 34-35.) Both parties argue about whether Chemeon has the ability to enforce the non-compete and confidentiality provisions in the employment agreement.

#### 1. Non-compete Provision

In Chemeon's reply, it appears to concede that under Nevada law it cannot enforce the non-compete provision in Semas' employment contract. (ECF No. 343 at 15-17.) Regardless, the Nevada Supreme Court has held that an employer in a corporate sale may not assign rights under an employee's covenant not to compete without the employee's consent where that consent is supported by independent consideration. *Traffic Control Serv. v. United Rentals Nw. Inc.*, 87 P.3d 1054, 1055 (Nev. 2004). Chemeon does not aver that either occurred here.

#### 2. Confidentiality Provision

Chemeon relies on a Seventh Circuit case, *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714 (7th Cir. 2003), to argue that Semas' confidentiality obligation under the employment agreement is not personal in nature and is not temporally limited. (ECF No. 324 at 11.) Even assuming that the confidentiality provision in Semas' employment agreement is enforceable, Chemeon does not produce evidence in opposition of Metalast Defendants' Motion of specific instances where Semas divulged trade secrets or confidential and proprietary information after the Release Date such that he breached this provision. The Court previously analyzed the alleged instances where Semas disclosed

24

trade secrets or confidential information and found that none of those instances demonstrated such a disclosure. *See* discussion *supra* Sec. V(A). As there is no evidence that Semas actually breached the confidentiality provision, the Court grants summary judgment in favor of Semas on Chemeon's claim for breach of the employment agreement.

### F.    Counterclaim for Breach of Contract

Plaintiff argues that Counterclaimants are unable to establish any damages as a result of Plaintiff's purported breach of the Settlement. (ECF No. 315 at 35-36.) Semas responds that he is not seeking damages for the breach of contract counterclaim; rather, he is seeking Chemeon's "specific performance of the covenant to stop using 'Metalast'" pursuant to the Settlement. (ECF No. 326 at 30.) In light of this clarification, the Court denies Chemeon summary judgment on Counterclaimants' breach of contract counterclaim.

### G.    Counterclaim for Specific Performance

Plaintiff argues that because of "Counterclaimants' fraudulent renewal of the Metalast mark . . . their equitable claim seeking specific performance should be denied." (ECF No. 315 at 36.) The Court disagrees.

A party asking a court for equitable relief "must come with clean hands." *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944). To determine whether unclean hands bars equitable relief, a court must consider "(1) the egregiousness of the misconduct at issue, and (2) the seriousness of the harm caused by the misconduct." *Las Vegas Fetish & Fantasy Halloween Ball, Inc., v. Ahern Rentals, Inc.*, 182 P.3d 764, 767 (Nev. 2008). Moreover, the alleged inequitable conduct must be connected with the matter in the litigation "otherwise the doctrine is not available as a defense." *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 662 (Nev. 2008).

Semas argues that with his specific performance claim he "is trying to enforce the settlement agreement, to obtain what he bargained for in exchange for agreeing to pay certain claims and releasing others" and that "none of the conduct alleged in [Plaintiff's

Motion] has anything to do with the formation or enforcement of the settlement agreement." (ECF No. 326 at 30.) Chemeon contends that because Semas negotiated for ownership of the wordmark as part of the Settlement, his hands are unclean with respect to that mark. (ECF No. 343 at 22.) The Court disagrees—it is possible that Semas' hands were "clean" at the time he negotiated the Settlement and the ownership of the wordmark and then became "unclean" when he renewed the wordmark's registration many months later. The two are unrelated and the theory of unclean hands as advanced in Plaintiff's Motion is unavailing. The Court therefore denies summary judgment in favor of Chemeon on this counterclaim.

## VI. HARRIS' MOTION[21] (ECF No. 331)

Harris moves for summary judgment on the claims he identifies as being brought against him: (1) misappropriation of trade secrets; (2) copyright infringement; (3) intentional interference with prospective economic advantage; and (4) unfair competition.[22] (ECF No. 331 at 6.) Chemeon moves for summary judgment against Harris on its claims for misappropriation of trade secrets claim and copyright infringement. (ECF No. 315 at 37; ECF No. 339 at 3.) Because granting Plaintiff's Motion as to Harris would inevitably require the Court to assess whether the requested relief—a permanent injunction against Harris—is warranted, and because neither Plaintiff nor Harris addressed the four-factor test for a permanent injunction, the Court denies Plaintiff's Motion as it relates to Harris and grants in part[23] and denies in part Harris' Motion.

///

---

[21]At the Hearing, the parties indicate that they may be able to reach a resolution on the claims against Harris. However, based on the subsequent filings (ECF Nos. 370, 372), it is apparent that the parties once again have reached an impasse as to settlement. The Court will refer Harris and Chemeon's dispute for settlement.

[22]Harris' Motion also includes an argument regarding Plaintiff's unjust enrichment claim (ECF No. 331 at 12), but he does not state that he is moving for summary judgment on that claim. Nor does Chemeon argue that it is asserting an unjust enrichment claim against Harris.

[23]Chemeon does not address Harris' Motion as to its claim for intentional interference with prospective economic advantage. Because no evidence whatsoever is offered to oppose summary judgment on this claim, the Court will grant summary judgment in favor of Harris on Chemeon's claim of intentional interference with prospective economic advantage.

26

"[P]ermanent injunctions may be granted on summary judgment[] given the proper record." *Sec. Exchange Comm'n v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). These four factors are: (1) that Plaintiff has suffered irreparable injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for Plaintiff's injury; (3) considering the balance of hardships between Plaintiff and Harris, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction against Harris. *See id.*

In Plaintiff's Motion, it seeks "a permanent injunction against [Harris] regarding use of Chemeon's trade secrets and copyrights" and "statutory attorney's fees and costs arising from the copyright infringement." (ECF No. 315 at 37.) Moreover, on April 7, 2017, Magistrate Judge Valerie P. Cooke ruled on Harris' motion *in limine* to exclude evidence of undisclosed damages, stating that "Chemeon concedes that they are not seeking compensatory damages from Harris, but rather permanent injunctive relief and attorneys' fees." (ECF No. 262 at 1 (citing ECF No. 247 at 4).) Thus, there is no doubt that Plaintiff seeks only a permanent injunction against Harris and does not seek money damages for past misconduct.

Neither party addresses whether Chemeon has suffered and continues to suffer irreparable harm from Harris' actions[24] or whether monetary damages for Harris' prior actions are inadequate to address Chemeon's injuries.[25] Moreover, neither party addresses whether a permanent injunction is warranted in light of Harris' representation at the Hearing that, as far as he knows, he no longer possesses the copyrighted items or

---

[24]In its reply, Chemeon points to Harris' involvement in another lawsuit as evidence that "Harris has elected to fight Chemeon at every turn" (ECF No. 337 at 13, 13 n.31), but without more this is not clearly relevant to Harris' current and future misappropriation of Chemeon's trade secrets or infringement of Chemeon's copyrighted works.

[25]In fact, any supposed admission by Harris that he previously utilized Plaintiff's copyright protected works or disclosed trade secrets or any evidence tending to demonstrate this would relate to past injury properly compensable through money damages, not permanent injunctive relief.

"trade secrets" Plaintiff contends he used in 2015 to help solicit investor funding for Semas. Similarly, at the Hearing Harris contended that he was not even aware what materials Chemeon believes he still possesses. Without any indication that Harris still has these materials or that there is a viable threat Harris will use them going forward (*cf.* ECF No. 315 at 27 (stating that Defendants' counsel, not Harris, had "threatened" to misappropriate a trade secret of Plaintiff during a March 2016 hearing)), it is not clear that Chemeon will suffer continued irreparable harm from Harris' actions such that a permanent injunction would redress that injury.

For these reasons, the Court grants Harris' Motion as to the claim for intentional interference with prospective economic advantage and denies the remainder of Harris' Motion. The Court denies Plaintiff's Motion as it relates to Harris.

## VII.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

It is therefore ordered that Metalast Defendants' Motion for Partial Summary Judgment (ECF No. 313) is granted in part and denied in part. Summary Judgment is granted in favor of Metalast Defendants as to Plaintiff's claims for: (1) breach of fiduciary duty; (2) breach of operating agreement; (3) contractual and (4) tortious breach of implied covenant of good faith and fair dealing; (5) conversion; (6) conspiracy; (7) breach of employment contract; (8) misappropriation of trade secrets; (9) interference with prospective economic advantage; (10) unfair competition; (11) statutory deceptive trade practices/consumer fraud; and (12) unjust enrichment. Summary judgment is denied as to Plaintiff's claim for copyright infringement.

It is further ordered that Plaintiff's Motion (ECF No. 315) is granted in part and denied in part. It is granted as to Plaintiff's claim of cancellation of the Logo Marks but denied as to all other claims.

It is further ordered that Harris' Motion (ECF No. 331) is granted in part and denied in part. It is granted as to the claim for intentional interference with prospective economic advantage. It is denied as to the remaining claims.

It is further ordered that Chemeon and Metalast Defendants must provide supplemental briefing of no more than five (5) pages within seven (7) days of this order on the issue of Chemeon's standing to bring its claim for cancellation of the Metalast wordmark registration.

DATED THIS 30th day of March 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE