1

2

3

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

4

5

6

7

8

9

10

| CHEMEON SURFACE TECHNOLOGY, | 3:15-cv-00294-CLB |
|---|---|
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]** |
| METALAST INTERNATIONAL, INC., *et al.*, | |
| Defendants. | |

11

### I.   SUMMARY

12

13

14

15

16

17

18

19

20

21

22

23

24

    This dispute has a long and difficult history spanning over many years, several lawsuits, and various courts.   It arises from the breakup of a business and a disagreement over the terms of a subsequent settlement agreement entered into between Plaintiff Chemeon Surface Technology, LLC ("Chemeon"), Counter-Defendants Dean Meiling ("Dean") and Madylon Meiling ("Madylon") (collectively referred to as "Plaintiffs" or "the Meilings"),[2] and Defendants and Counterclaimants David M. Semas ("Semas"), Metalast International, Inc. ("MI-INC"), and Metalast International, LLC ("MI-LLC") (collectively referred to as "Defendants").   The court conducted a bench trial on November 9, 10, 12, 13, and 17, 2020.   (ECF Nos. 600, 603, 605, 606, 608.)   After reviewing the parties' trial briefs, proposed findings of fact and conclusions of law, the trial transcripts, trial exhibits, and the court's notes from trial, the court hereby makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

25

——————————————

26

27

[1]    On May 13, 2019, this case was referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF No. 494.)

28

[2]    To avoid confusion, the court refers to the Meilings individually by first name.

## II.   CLAIMS

Chemeon commenced this action on June 3, 2015 alleging various claims.  (*See* ECF No. 1.)  Chemeon amended its Complaint multiple times, ending with the operative complaint, the Third Amended Complaint (ECF No. 535) filed on October 31, 2019. Defendants' asserted various counterclaims related to an alleged breach of a settlement agreement reached by the parties prior to the lawsuit being filed as well as other claims. (*See* ECF No. 51.)

Following extensive pretrial motion practice, which will be further discussed below, the following tables identify the claims and counterclaims that proceeded to trial:

| Chemeon's Third Amended Complaint (ECF No. 535) | | |
|---|---|---|
| Claim # | Name | Issue Presented at Trial |
| 2 | Declaratory judgment remedies | Limited to issue of whether Attorneys' Fees should be assessed based on exceptional circumstances pursuant to 15 U.S.C. § 117(a) |
| 5 | Common law trademark infringement | Nothing dismissed at SJ; no limit |
| 6 | Copyright infringement | Limited to Renewal of Registration on June 21, 2015 and two specimens – IC 001, IC 009 and the '206 mark |

| Defendants' Counterclaims (ECF No. 51) | | |
|---|---|---|
| Claim # | Name | Issue Presented at Trial |
| 1 | Breach of contract | Related to breach of settlement agreement by use of "formerly Metalast," etc. |
| 2 | Breach of the covenant of good faith and fair dealing | Relitigating this issue |
| 7 | Specific performance of settlement agreement | Prohibit future use of the "formerly Metalast" name, etc. |

III.   **FINDINGS OF FACT**[3]

    A.   <u>**Background Related to MI-INC and MI-LLC**</u>

    1.     In January 1993, Semas commenced negotiations to license a patented metal coating process from a Japanese inventor.  Trial Tr. Vol. 1, 70:20-21-71:7; 74:12-16.  Eventually, Semas obtained the rights to this technology through a license with the inventor.  Trial Tr. Vol. 1, 74:12-20.

    2.     These rights were initially acquired by Semas through his fictitious business entity, "Metalast USA."  Trial Tr. Vol. 1, 66:18-22.  Through this licensed technology, the product "Metalast AA-100" was initially marketed and sold by Metalast.  Trial Tr. Vol. 1, 66:18-22; 70:19-20-71:7; 74:20-75:7.

    3.     On May 16, 1994, Semas formed "Metalast International, Inc" ("MI-INC"), which was incorporated as a Nevada corporation.  Stipulated Facts ¶ 1.

    4.     From its inception until April 25, 2013, Semas controlled MI-INC and served as its President and Chief Operating Officer.  Stipulated Facts ¶ 6; Trial Tr. Vol. 1, 66:21-22.

    5.     On December 20, 1994, "Metalast International LLC" ("MI-LLC") was organized as a Nevada limited liability company pursuant to an operating agreement, which was later amended on June 6, 1996.  Stipulated Facts ¶ 2; Ex. 1

    6.     MI-LLC was as a separate business entity from MI-INC and its purpose was to raise equity investments to expand the Metalast business.  Trial Tr. Vol. 1, 68:13-15.  The shares—in the form of membership interests—were primarily sold through registered NASD brokers and broker-dealers.  Trial Tr. Vol. 1, 136:24-25—137:1-5.

    7.     Per the MI-LLC operating agreement, for this entity to become operational, MI-LLC had to reach certain minimum levels of equity investments.  MI-LLC achieved

---

[3]    All "Stipulated Facts" (ECF No. 595) are incorporated into these Findings of Fact.

those milestones and became operational in July 1995.  Trial Tr. Vol. 1, 66:18-25—67:1-2; 69:9-12.

8.      From its inception until April 25, 2013, MI-INC was the manager of MI-LLC.  Stipulated Facts ¶ 5.

9.      In 1996, MI-INC entered into a license agreement with MI-LLC permitting MI-LLC the right to use the Metalast trademarks.  Ex. 15; 16.

10.     The Metalast word mark and logo marks were always registered in the name of MI-INC, and never in the name of MI-LLC.  Ex. 323.

11.     Specifically, in 1995, Semas filed the first applications for registration of the word mark and logo marks.  On those applications, the registered owner was listed as MI-INC.  Ex. 323.  In 1996, the United States Patent and Trademark Office ("USPTO") granted these applications and issued the registrations explicitly listing MI-INC as the registered owner of the marks.  Ex. 323.

12.     Between 1996 and 2011, Semas filed several subsequent applications for registration of these trademarks and each application listed the registered owner as MI-INC.  Ex. 323.  In each of the subsequently issued registrations from the USPTO, MI-INC was again explicitly listed as the registered owner.  Ex. 323.

13.     The identity of the registered trademark owner was also disclosed to MI-LLC members, including Dean, from the time of the initial registration through regular company communications to members.  Exs. 626-629.

14.     Chemeon questioned whether the License Agreement (Exs. 15 and 16) was created on or about August 12, 1996 but offered no evidence at trial that the License Agreement was created at some later date.

15.     The Metalast word mark and logo marks were initially registered in the name of MI-INC, not MI-LLC.  Stipulated Facts, ¶¶ 8, 11.  The registered ownership of the marks was never transferred from MI-INC to MI-LLC.  There are no documents transferring ownership of the marks from MI-INC to MI-LLC.  There is no evidence of any unwritten agreement to transfer ownership of the marks from MI-INC to MI-LLC.

16.     The tax treatment of the fees and expenses paid by MI-LLC to maintain the mark registrations does not demonstrate that MI-INC ever agreed to transfer ownership of the marks to MI-LLC.

**B.     Meiling Investments and Loans to MI-LLC**

17.     Prior to investing in MI-LLC, Dean retired from a long and successful career in finance in the 1990s.  *See* Trial Tr. Vol. 2, 210:6-211:20.

18.     In 1999, Dean was asked by a friend to analyze an investment in MI-LLC.  Trial Tr. Vol. 2, 213:19-24.  After conducting his analysis, Dean advised his friend not to make an investment in MI-LLC due to it being high risk.  However, Dean decided to make his own investment into the company.  Trial Tr. Vol. 2, 214:6-23.

19.     Ultimately, Dean invested $1.2 million and received a member interest in MI-LLC.  Trial Tr. Vol. 1, 85:21-25; Trial Tr, Vol, 2, 214:24-25—215:1-2.

20.     Between 1999 and 2013, Dean, through his business entities, including DSM Partners, Ltd., ("DSM") a Colorado limited partnership, lent money to MI-LLC on various occasions.  Trial Tr. Vol. 2, 215; 222-225; *see also* Ex. 204.  Through these various loans, DSM became of secured creditor of MI-LLC.

21.     By 2013, Dean had invested over $9 million ($6 million, plus accrued interest), in MI-LLC.  Trial Tr. Vol. 2, 225:14; Trial Tr. Vol. 3, 133:18-24.

22.     In February 2013, Semas informed Dean that the company could not make payroll or rent.  Trial Tr. Vol. 2, 225:17-25—226:1-5.  In March 2013, Dean agreed to loan additional funds to keep the company operating, with the provision that if Semas could not find someone else to provide future funds, Semas would have to step down from his management role and turn control over to someone else.  *Id.*

23.     In early April 2013, Semas again informed Dean that the company could not make payroll or rent.  Trial Tr. Vol. 2, 226:11-24.

///

///

///

**C.  Receivership Action**

24.   On April 16, 2013, DSM Partners, Ltd., commenced litigation in the Ninth Judicial District Court of the State of Nevada entitled *DSM Partners, Ltd. v. Metalast International, LLC and Metalast International, Inc.*, Case No. 13-cv-0114 (hereinafter "Receivership Action").[4]  This action sought a receivership to take MI-LLC out of the control of Semas.  Ex. 150.

25.   On April 25, 2013, the court in the Receivership Action appointed James Proctor as Receiver to manage the business of MI-LLC.  From that point, MI-INC was no longer the manager of MI-LLC, and Mr. Proctor excluded Semas from all MI-LLC operations.  Stipulated Facts, ¶ 14.

26.   On November 4, 2013, the court in the Receivership Action approved a sale of certain MI-LLC assets, which were described as collateral for the various loans from DSM to MI-LLC.  Stipulated Facts, ¶ 17; Ex. 204.

27.   On the same date when Dean's entity commenced the Receivership Action, Dean was aware that the security agreement and related loan documents did not list the Metalast word mark or logo marks as part of the collateral for the loans.  Ex. 285.

**D.  Semas Bankruptcy**

28.   On December 11, 2013, Semas filed a Voluntary Petition in *In re: David M. Semas and Susan O. Semas*, Case No. 13-52337 (hereinafter "Semas Bankruptcy"), in the United States District Court for the District of Nevada ("Bankruptcy Court").[5]  Trial Tr. Vol. 4, 197:12-18.

29.   In the Semas Bankruptcy, Chemeon (then known as "Metalast Surface Technology, LLC") filed an Adversary Complaint entitled *Metalast Surface Technology, LLC v. David M. Semas and Metalast International, Inc.*, Adv. No. 14-05036 (the "Adversary Proceeding").  Ex. 502.

---

[4]   The court takes judicial notice of the docket and filings in the Receivership Action.

[5]   The court takes judicial notice of the docket and filings in the Semas Bankruptcy.

30.     The Adversary Complaint included claims for breach of contractual guarantee, violation of the Nevada Uniform Securities Act, violation of the Federal Securities law, declaratory judgment with respect to ownership of intellectual property, breach of fiduciary duty, fraud, misrepresentation, fraudulent conveyance, conversion, non-dischargeability, and fees and costs.  Ex. 502.

31.     Further, Chemeon claimed in its Proof of Claim (Ex. 501) and Adversary Complaint (Ex. 502), that Chemeon, and not Semas, owned the Metalast word mark and logo marks.

32.     On January 27, 2015, Semas, MI-INC, the Meilings and Chemeon attended a Settlement Conference mediated by Hon. Gregg W. Zive, United States Bankruptcy Judge.  Exs. 213 and 503.

33.     At the Settlement Conference, bankruptcy attorneys Janet Chubb and Louis Bubala represented Chemeon and the Meilings. Moreover, intellectual property attorney Robert Ryan,[6] who by then had been retained by the Meilings, was available by phone for consultation, if needed, during the conference.  Trial Tr. Vol. 3, 129:17-24.

34.     Semas was represented by bankruptcy attorney Steven Harris and intellectual property attorneys Ian Burns and Michael Rowe at the conference.

35.     Ultimately, the parties reached a Settlement.[7]  Ex. 503.

36.     At the conclusion of the Settlement Conference, Judge Zive placed the material terms of the agreement on the record and canvassed all the parties as to their agreement to those terms and intent to enter into the agreement.  Ex. 503.

---

[6]     Mr. Ryan is the lead attorney of record in this litigation.

[7]     "Settlement" or "Settlement Agreement" refers to the settlement agreement referenced in the Stipulated Facts, ¶¶ 22-25, the terms for which are stated in the Transcript of Settlement Conference (Ex. 213, 503) and as approved in the "Order Approving Motion for Order Approving Compromise and Settlement of Claims of Meiling Creditors Pursuant to FRBP 9019."  Ex. 513.

37.    The first material term of the Settlement Agreement of significance in this case is the "ban provision."  This material term is stated as follows:

> [Chemeon] through the Meilings, will continue to use the [disputed Metalast] mark for 90 days following entry of the order approving the settlement agreement by Judge Beesley, if he does approve it.  At the end of that 90-day period, [Chemeon], the Meilings, and any other entity in which the Meilings have an interest, will no longer be able to use the name Metalast *in any fashion or manner whatsoever.*  Following that 90 days, the mark will be owned by Mr. and Mrs. Semas, or any entity in which they choose to transfer that mark.

Ex. 503, page 6, lines 2-11 (emphasis added).

38.    The second material term of the Settlement Agreement of significance in this case is the "release provision."  This material term is stated as follows: "The Meilings agree to dismiss [the adversary proceeding] with prejudice and to waive any and all claims they have from the beginning of time and through the date of entering of the settlement agreement that they may have, known or unknown, anticipated or unanticipated, against [Semas]," that the Semas's would "release the Meilings and [Chemeon] from any claims they may have … from the beginning of time until the settlement agreement is approved," and that the release was one "between these parties or related entities."  Ex. 503, page 8, lines 11-24.

39.    Despite placing the material terms on the record, the Meilings testified that, at the time of the Settlement Conference, they believed the provision barring the use of the term "Metalast" only extended to such things as letter head, business signs, and the like.  Trial Tr. Vol. 3, 36:23-25; 221:15-23; 234:8-14.

40.    On February 9, 2015, Debtors Semas (and Susan Semas) filed a Motion for Order Approving Compromise and Settlement of Claims of Meiling Creditors Pursuant to FRBP 9019 ("Motion to Approve Settlement").  Ex. 504.  This document underscored the interpretation of the ban provision by Semas, which was far broader than what the Meilings claimed they understood the ban provision to mean.

41.    Semas's attorney Steve Harris drafted a proposed written Settlement Agreement, which he forwarded to Chemeon's counsel, Janet Chubb.  Trial Tr. Vol. 4,

8

207:11-15.  Harris testified Chubb called him in a panic because the terms in the written Settlement Agreement, which reflected what was in the transcript of the Settlement Conference, did not comport with the Meilings' understanding of the Settlement Agreement.  Trial Tr. Vol. 4, 209:2-25.

42.     At this point, Chemeon and the Meilings were fully aware that the "ban provision", as interpreted by Semas, extended to any use of the term "Metalast", in commerce – not simply business signs, letterhead or the like.  Ex. 506.  Specifically, Chemeon would not use the term "Metalast" in commerce to market, sell, or advertise products.

43.     The Meilings and Chemeon had an opportunity to oppose judicial approval of the Settlement.  Exs. 213 and 503.  The Meilings filed a response opposing approval of the Settlement.  Ex. 505.  In that document, the Meilings stated that they "opposed the settlement because there is no common understanding of agreement reached at the mediation".  *Id.*  The opposition was supported by declarations from Madylon, Dean, and Ted Ventresca.  Exs. 506, 507, 509.

44.     Moreover, in their response opposing approval of the Settlement, Chemeon and the Meilings argued they should be permitted to use the term "formerly Metalast" pursuant to the Ninth Circuit case, *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487 (9th Cir. 2000) ("*Steppenwolf*").  Ex. 505 at 11.  Semas filed a reply in support of the Motion to Approve Settlement, which responded to the *Steppenwolf* argument.  Ex. 511.

45.     While the Motion to Approve Settlement was pending, counsel for the Meilings requested a further conference with the settlement judge, Hon. Gregg W. Zive.  Ex. 510.  During the status conference, Janet Chubb stated there was a dispute about enforcement of the Agreement because the Meilings did not understand that they were agreeing to stop using the name "Metalast" on their products, as well as in their business name.  *Id.* at 2-3.  However, Judge Zive reiterated that the terms in the Motion to

1  Approve Settlement were practically verbatim with what was put on the record at the
2  completion of the Settlement Conference.  *Id.* at 13.

3       46.    In February of 2015, the Meilings obtained new bankruptcy counsel,
4  Timothy Lukas.[8]  Trial Tr. Vol. 3, 144:19-22.

5       47.    Despite claiming there was "no common understanding" related to the
6  terms of the Settlement, before the hearing on Semas's Motion to Approve Settlement,
7  the Meilings filed a formal pleading *withdrawing* their opposition to the Settlement
8  Agreement.  Trial Tr. Vol. 4, 217:9-13.  The Meilings testified that the opposition was
9  withdrawn on the advice of counsel.  Trial Tr. Vol. 3, 41:19-25—42:1; 237:12-17. By
10  withdrawing this opposition, however, Chemeon and the Meilings knew that if the
11  Bankruptcy Court approved the Settlement as is, the ban provision would prohibit their
12  use of the term "Metalast" - after the 90-day transition period - to market, sell, advertise,
13  and/or in variety of other uses of this term on their products and/or transactions in
14  commerce.

15       48.    On March 2, 2015, the court in the Semas Bankruptcy conducted a hearing
16  on Semas's Motion to Approve Settlement.  Following the hearing, the Meilings and
17  Chemeon objected to the form of order approving the Settlement.  Ex. 512.  On March
18  11, 2015, the Bankruptcy Court entered its order approving the Settlement, as stated on
19  the record at the conclusion of the Settlement Conference.  Ex. 513.  By approving the
20  Settlement Agreement, all claims arising between the parties prior to March 11, 2015
21  were expressly released by the parties.

22       49.    Following the Settlement Conference, the Meilings and Chemeon
23  recognized that Semas owned the Metalast trademarks, and that Semas was free to use
24  the Metalast trademarks to build a new company, so long as Semas did not exploit trade
25  secrets that belong to Chemeon.  Ex. 538.  *See also* Exs. 215, 216, 218, and 539.
26  Counsel for Chemeon and Semas also exchanged new Settlement terms. Exs. 615, 616.

27  _____

28    [8]    Mr. Lukas is an attorney of record in this litigation.

50.   The circumstances surrounding the negotiation and Bankruptcy Court approval of the Settlement make reasonable Semas's expectation that the Meilings would not use the term "Metalast" to market advertise, market, sell, etc. its products in commerce **after June 15, 2015**.

51.   After the Settlement, Semas made several attempts to sell, license, or otherwise monetize the Metalast brand name.   Exs. 219, 220, 230.   Following the Settlement, Semas expected that he would be able to monetize the Metalast brand name.   Semas's expectation was reasonable under the circumstances.   Dean also testified that Semas could open whatever business he wanted and use the word "Metalast" in that context and monetize its value if he acquired the business.   Trial Tr. Vol. 3, 43:4-6; 47:2-4.

52.   The Meilings and Chemeon *never* demanded rescission of the Settlement Agreement before or after the Bankruptcy Court approved the Settlement.   The Meilings and Chemeon never offered to restore the *status quo ante*.

53.   Both Meilings testified that these actions were taken based on advice given to them by their counsel that a different course of action could be taken.   Trial Tr. Vol. 3, 41:23-25—42:1-6; 237:12-17.

54.   For his part, Semas fully performed the Settlement by including disputed claims in his bankruptcy plan of reorganization and performing according to that plan of reorganization.   Trial Tr. Vol. 3, 178:14-16.

**E.**   **Use of "Formerly Metalast" or "Formerly known as Metalast"**

55.   After March 11, 2015, Chemeon began referencing itself as "formerly Metalast" and "formerly known as Metalast."   In Ex. 518, Ex. 520, and Ex. 523, Chemeon referenced itself as "Chemeon Surface Technology (formerly Metalast), with roots dating back to 1994...."   In addition, on its commercial forms, Chemeon referred to itself as "formerly Metalast."   *See* Ex. 524 (Order Confirmation), Ex. 525 (Invoice), Ex. 526 (Purchase Order), Ex. 527 (Quotation).

11

56.     Pursuant to the November 3, 2013 Order in the Receivership Action, (Stipulated Facts, ¶ 13), Chemeon purchased identified assets from MI-LLC.  Chemeon did not buy the equity in MI-LLC and did not assume its liabilities.  However, after the Settlement, Chemeon published an email to "customers, distributors, and friends" that "The Company previously known as Metalast Surface Technology LLC (and earlier as Metalast International LLC) officially changed its name to Chemeon Surface Technology LLC."  Ex. 516.  This statement was incorrect because Chemeon was never known as "Metalast International LLC."  Dean explained that Chemeon's statement "was worded this way just because people often thought of it that way. I agree with you that we bought the assets. We did not buy the company."  Trial Tr. Vol. 3, 150:17-19.

57.     After March 11, 2015, Chemeon began referring to its products as "formerly Metalast."  Its shipping label identifies a product as "Chemeon TCP-HF SP (formerly Metalast TCP-HF)."  Ex. 528.  *See also* Ex. 529.  On its technical data sheets and safety data sheets, Chemeon referenced each of its products as "formerly Metalast." Exs. 540-591.

58.     On its technical data sheets and safety data sheets, Chemeon does not disclose the manufacturers of any of the chemical products.

59.     On its technical data sheets and safety data sheets for products sold by other companies under different names, Chemeon does not disclose the other brand or product names under which those products are sold.

60.     On its technical data sheets and safety data sheets for products sold by other companies under different names, Chemeon does not disclose the other "common" names under which those products are sold.

61.     Chemeon did not seek or obtain any license to reference itself or its products as "formerly Metalast" or "formerly known as Metalast" on any labels, advertisements, technical data sheets, safety data sheets, or otherwise.

62.     Chemeon offered no evidence that it ever stopped referring to its products as "formerly Metalast" after June 15, 2015 or that it has any plans to stop in the future.

63.   After the Bankruptcy Court's approval of the Settlement, Chemeon issued a series of press releases indicating that "All QPD/QPL Mil-Spec product certifications for Chemeon's products remain intact and in force in all respects...." Exs. 250, 254, 521, 522. Further, Chemetall USA, Inc. circulated an email stating, in relevant part:

> FYI - All name change associated to our Navy license is complete and the DoD QPD is in the process of reflecting the CHEMEON name associated to our TCP-HF suite of products. The labeling and our TDS sheets and MSDS sheets always will refer to "formerly Metalast TCP-HF .... etc....)

Ex. 223 (punctuation in original).

64.   Chemeon's use of the terms "formerly Metalast" and "formerly known as Metalast" were not limited to historical references.

65.   Semas was unable to sell, license, or otherwise monetize his ownership of the Metalast word marks because Chemeon was using the term "formerly Metalast" to describe itself and its products.

66.   By using the phrase "formerly Metalast" to market Chemeon and Chemeon's products in commerce, the Meilings deprived Semas of an important and reasonably expected benefit of the Settlement, namely the promise that the Meilings and their business entity would never, after the 90-day transition period, use Metalast in "any fashion or manner whatsoever."

67.   By causing their entity, Chemeon, to sue Semas on claims that were plainly barred by the release provision in the Settlement (*See* Amended Order, ECF No. 411), the Meilings deprived Semas of an important and reasonably expected benefit of the Settlement, specifically the mutual release of all claims between the parties that pre-dated the Settlement Agreement.

**F.**   **Metalast Product Lines**

68.   The two primary products or product lines at issue in this case are: 1) Metalast AA-200; and 2) Metalast TCP-HF.

69.     Metalast AA-200 was initially sold by "Metalast USA," under the name "AA-100."  This product was later renamed Metalast AA-200. Trial Tr. Vol. 1, 64:17-20; 66:15-22, 128:3-5.

70.     Metalast AA-200 was sold by MI-LLC after it became operational.  MI-LLC never labeled, advertised, or sold a product as "AA-200" without the "Metalast" preceding the "AA-200" in commerce.  *See* Trial Tr. Vol. 1, 152:5-19.

71.     Metalast AA-200 is chemistry that is available from at least two vendors and is sold by others under different names.  All parties to the trial agree that the identity of the suppliers of the chemical is a trade secret not to be revealed in these Findings of Fact.

72.     On May 4, 2004, MI-LLC entered into a Nonexclusive License with the United States, as represented by the Secretary of the Navy, to practice certain patents generally referenced as "Navy TCP."  In August and September 2006, MI-LLC signed a new Nonexclusive License to practice the "Navy TCP" patents ("Navy TCP License"). Ex. 53.

73.     Pursuant to the Navy TCP License, MI-LLC began selling products named "Metalast TCP-HF", "Metalast TCP-HF EPA", "Metalast TCP-HF SP", "Metalast TCP-HF Touch-Up Pen", and "Metalast TCP-NP".  MI-LLC never labeled, advertised, or sold a product as "TCP-HF" (or any of the variants) without "Metalast" preceding the "TCP-HF" in commerce.  *See* Trial Tr. Vol. 1, 152:5-25.

74.     After the Settlement, and at Chemeon's request, the Department of Navy approved a change in the QPL listings for "Metalast TCP-HF" products to "Chemeon TCP-HF (formerly Metalast)."  Ex. 530.

75.     MI-LLC did not manufacture its own "Metalast TCP-HF" products, but relied upon two chemical manufacturing firms, QualiChem, Inc. and Chemetall USA, Inc., to manufacture and distribute the products.  Trial Tr. Vol. 1, 138:1-4; Trial Tr. Vol. 2, 84:21-25.

76.   Chemetall USA, Inc. created its own shipping label for Metalast TCP-HF products.  *See* Ex. 201, page 3.

77.   QualiChem, Inc. created its own shipping label for Metalast TCP-HF products.  *See* Ex. 201, page 2; Ex. 611; *see also* Exs. 67, 68.

78.   Since January 1, 2015, Semas has never sold, or advertised to sell, any product that practices the patents in the Navy TCP license.  Trial Tr. Vol. 1, 131:20-132:15.

79.   Since January 1, 2015, Semas has never sold, or advertised to sell, Metalast AA-200, or that chemical under any other brand or product name.  Trial Tr. Vol. 1, 132:16-133:16.

80.   Chemeon does not manufacture its product called AA-200.  Chemeon buys the product from one of two known sources, and re-labels the product.  Chemeon's technical data sheet for AA-200 does not disclose the manufacturer, distributor, or other product names for the same chemical product.

81.   Chemeon does not manufacture its cleaners, deoxifiers, dyes, etches seals, and other products identified in Exs. 548 through 592.  Chemeon buys those products from or through other manufacturers and distributors, and does not disclose the identity of the manufacturers, distributors, brands, or product names in its technical data sheets in Exs. 548 through 592.

82.   Industrial, defense, and aerospace industry specifications from Sikorsky, Pratt & Whitney, Northrop Grumman, Weber Aircraft, Hughes Network Systems, General Dynamics, BAE Systems, FLIR Systems, and others called for "Metalast TCP-HF" products.  Exs. 194, 222.

83.   Before the Bankruptcy Court approved the Settlement, Chemeon knew that industry specifications called for Metalast TCP-HF products, and that losing the right to call products "Metalast" would be detrimental to Chemeon's business:

> The loss of the trademark requires rebranding 120 products sold in 230 formulations.  Many of the contracts and contract specifications call for

"Metalast" products; some of them set up purchase standards for multi-year periods.

For example, the U.S. Army's Joint Manufacturing & Technology Center specifically orders Metalast TCP-HF.  Other major companies, including Hughes, Boeing, Lockheed Martin, and General Dynamics, specify or identify Metalast products in their list of approved chemicals and provide directions for the chemical treatment with Metalast products.

If the Meilings are no longer able to identify their products with the Metalast trademarks, they face consequences if customers decide the newly named products do not comply with contract terms, purchase requirements, or treatment standards.

Decl. Ted Ventresca (Chief Operating Officer of Chemeon), February 17, 2015.  Ex. 509.

84.     MI-LLC obtained certifications for Metalast TCP-HF products for the Navy Qualified Product List ("QPL") or Qualified Product Database ("QPD").    QPL/QPD certification requires inspections of both the seller of the products (MI-LLC) and the manufacturers of the products (e.g., Chemetall and QualiChem), including the specific plants where the products are manufactured.  *See e.g.*, Ex. 531, pp. 3, 5, 7.

G.     Copyright Issues

85.     On March 20, 2017, Chemeon applied for registration of a copyright in the 2004 Product Label. Ex. 291.  The Copyright Office issued a Certificate of Registration for the work with an effective date of March 20, 2017.  Ex. 290.  Chemeon did not establish when the Copyright Office issued the Certificate of Registration 2004 Product Label.

86.     On March 20, 2017, Chemeon applied for registration of a copyright in the 2003 Job Pro Web Page Advertisement.  Ex. 293.  The Copyright Office issued a Certificate of Registration for the work with an effective date of March 20, 2017.  Ex. 292. Chemeon did not establish when the Copyright Office issued the Certificate of Registration for the 2003 Job Pro Web Page Advertisement.

87.     Chemeon offered no direct evidence to establish who created the 2003 Job Pro Web Page Advertisement, or any components of that work.

88.     When Chemeon applied for registration of the 2004 Product Label, Chemeon represented that MI-LLC was the author of the work.  Ex. 291 (at ECF No.

535-5, page 75). However, there is evidence that the 2004 Product Label was "authored" by QualiChem. Ex. 611.

89.    On January 29, 2020, Chemeon obtained an Assignment of All Rights in Work with respect to the 2004 Product Label from QualiChem. Ex. 304. The Assignment of All Rights in Work recites that QualiChem "<u>may have</u> created an original work of authorship in the product label..."

90.    On June 21, 2015, Ian Burns (an attorney representing Semas) submitted a Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of a Mark under Sections 8 & 9" for the renewal of the Metalast word mark under Registration No. 2963106. Ex. 244, 245 ("USPTO Renewal Application"). As part of, or in support of, the USPTO Renewal Application, Burns submitted PDF copies of the 2004 Product Label and the 2003 Job Pro Web Page Advertisement.

91.    Chemeon offered no evidence that Semas provided the 2003 Job Pro Web Page Advertisement to Burns.

92.    Chemeon offered no evidence that Semas directly, or through any agent, copied or otherwise infringed the Copyright Works[9] after June 21, 2015. Chemeon offered no evidence that Semas threatened to copy or otherwise infringe the Copyright Works in the future.

93.    By this reference, these Findings of Fact incorporate any factual findings stated in the following Conclusions of Law.

**IV.    PROCEDURAL HISTORY**

To clearly explain the claims that proceeded to trial and are therefore decided by these findings of fact and conclusions of law, the court must provide a detailed explanation of the relevant procedural history.

_____

[9]    "Copyright Works" refers to the "works" referenced as the 2004 Product Label in Exs. 290 and 291, and the 2003 Job Pro Web Page Advertisement in Exs. 292 and 293.

1

## A.  Initial Complaint

2      Chemeon commenced this action on June 3, 2015, seeking relief for: (1)

3  misappropriation of trade secrets under NRS 600A.030; (2) declaratory judgment of no

4  trademark infringement; (3) cancellation of the logo trademarks; (4) common law

5  trademark infringement; (5) copyright infringement; (6) intentional interference with

6  prospective economic advantage; (7) unfair competition under 15 U.S.C. § 1125(a); (8)

7  statutory deceptive trade practices/consumer fraud; and (9) unjust enrichment.  (ECF

8  No. 1.)  On July 6, 2015, Defendants answered the complaint (ECF No. 32).

9

## B.  Defendants' Counterclaims

10      On September 3, 2015, Defendants filed counterclaims against Chemeon and the

11  Meilings, seeking relief for: (1) breach of contract; (2) breach of the covenant of good

12  faith and fair dealing (i.e., "bad faith"); (3) trademark dilution; (4) trademark infringement;

13  (5) trademark infringement and unfair competition under state law; (6) trademark dilution

14  under state law; and (7) specific performance of settlement.  (ECF No. 51.)  On October

15  2, 2015, Chemeon and the Meilings filed their answer to the counterclaim.  (ECF No.

16  62.)

17      Pursuant to a stipulation of the parties, Defendants' voluntarily dismissed, with

18  prejudice, the counterclaims which sought relief related to trademark dilution and

19  trademark infringement under both state and federal law, leaving only breach of contract,

20  bad faith, and specific performance counterclaims.  (ECF No. 199.)

21      On May 16, 2016, Defendants filed a motion for partial summary judgment as to

22  their first claim for relief for breach of contract.  (ECF No. 130.)  The Court denied the

23  motion, ruling that the Settlement Agreement did not unambiguously impose an

24  "absolute ban" on the use of the Metalast name after June 15, 2015 based, in part, on

25  the holding of the Ninth Circuit case, *Steppenwolf*, 236 F.3d 487.  (ECF No. 233.)

26      On March 9, 2017, Chemeon, in turn, filed a motion for summary judgment as to

27  the remaining counterclaims.  (ECF No. 227.)  The Court heard oral argument on the

28  motion and issued an oral ruling denying the motion, again stating that the Settlement

Agreement did not unambiguously impose an absolute ban on the use of the Metalast name.  (*See* ECF Nos. 367, 368, 409.)

Thus, Defendants' First Claim for Relief (breach of contract), Second Claim for Relief (bad faith), and Seventh Claim for Relief (specific performance) counterclaims proceeded to trial.

### C.    Second Amended Complaint

Chemeon filed its Second Amended Complaint on November 11, 2017. (ECF No. 348).  The Second Amended Complaint, which was the operative complaint for much of the litigation, sought relief for: (1) misappropriate of trade secrets under NRS 600A.030; (2) declaratory judgment of no trademark infringement; (3) cancellation of the Metalast registration; (4) cancellation of the logo trademarks; (5) common law trademark infringement; (6) copyright infringement; (7) intentional interference with prospective economic advantage; (8) unfair competition under 15 U.S.C. § 1125(a); (9) statutory deceptive trade practices/consumer fraud; (10) unjust enrichment; (11) breach of fiduciary duty; (12) breach of operating agreement; (13) contractual breach of implied covenant of good faith and fair dealing; (14) tortious breach of implied covenant of good faith and fair dealing; (15) conversion; (16) civil conspiracy; and (17) breach of contract/employment agreement.  (ECF No. 348.)  Defendants filed their answer to the Second Amended Complaint on November 15, 2017.  (ECF No. 351.)

On June 19, 2017, Defendants filed a motion for partial summary judgment (ECF No. 313).  The Court granted Defendants' motion for summary judgment as to Chemeon's claims for: (1) breach of fiduciary duty; (2) breach of operating agreement; (3) contractual breach of implied covenant of good faith and fair dealing; (4) tortious breach of implied covenant of good faith and fair dealing; (5) conversion; (6) conspiracy; (7) breach of employment contract; (8) misappropriate of trade secrets; (9) interference with prospective economic advantage; (10) unfair competition; (11) statutory deceptive trade practices/consumer fraud; and (12) unjust enrichment.  (*See* ECF No. 411.) Defendants' motion was denied as to Chemeon's claim for copyright infringement.  (*Id.*)

On June 19, 2017, Chemeon also filed a motion for summary judgment (ECF No. 315.)  The Court granted Chemeon's motion for summary judgment as to Chemeon's claim of cancellation of the Logo Marks (Fourth Claim for Relief) but denied it as to all other claims.  (*See* ECF No. 411.)

On April 24, 2018, Chemeon filed a motion for reconsideration of the summary judgment order.  (ECF No. 412).  Upon reconsideration, the Court granted Chemeon's Second Claim for Relief (declaratory judgment of no trademark infringement as to the word marks only.)  (*See* ECF No. 425.)  The Court also granted summary judgment on the claim that Semas had abandoned his logo mark and Semas then cancelled his federal logo registrations.  (ECF No. 430.)

On July 25, 2018, Defendants filed a renewed motion for summary judgment (ECF No. 427), which the Court granted as to Chemeon's Third Claim for Relief (cancellation of the Metalast registration) based on Chemeon's lack of standing.  (*See* ECF No. 481.)

Thus, Chemeon's Second Claim for Relief (as to an award of exceptional case attorney's fees only), Fifth Claim for Relief (common law trademark infringement), and Sixth Claim for Relief (copyright infringement) claims proceeded to trial.

### D.     Third Amended Complaint

On October 31, 2019, Chemeon filed its Third Amended Complaint.  (ECF No. 535.)  The Third Amended Complaint amended the copyright infringement claim (Sixth Claim for Relief) only, to comply with the U.S. Supreme Court's opinion in *Fourth Estate Public Benefit Corp. v. Wall-Street.com LLC*, 139 S.Ct. 881 (2019).  (*See* ECF No. 522.)  Defendants filed their answer to the Third Amended Complaint on November 18, 2019.  (ECF No. 539.)

///

///

///

1   **V.    CONCLUSIONS OF LAW[10]**

2       **A.    Defendants' Counterclaim 1 – Breach of Contract**

3       "A settlement agreement is a contract, [and] its construction and enforcement are

4   governed by principles of contract law."  *May v. Anderson*, 121 Nev. 668, 119 P.3d 1254,

5   1257 (2005).  *See also Ashker v. Newsom*, 968 F.3d 939, 944 (9th Cir. 2020) (applying

6   California law).

7       The Settlement Agreement was formed in Nevada.  Chemeon, MI-INC, MI-LLC,

8   and the Meilings are all citizens of Nevada.  This case to interpret the Settlement was

9   brought in the District of Nevada.  Nevada law governs the formation, interpretation, and

10  enforcement of the Settlement.[11]

11      Contract interpretation is a question of law.  *See Shelton v. Shelton*, 119 Nev.

12  492, 497, 78 P.3d 507, 510 (2003).  "A basic rule of contract interpretation is that '[e]very

13  word must be given effect if at all possible.'"  *Musser v. Bank of America*, 114 Nev. 945,

14  949, 964 P.2d 51, 54 (1998) (internal quotations omitted).  When construing a contract, a

15  court should consider the contract as a whole and "should not interpret a contract so as

16  to make meaningless its provisions." *Phillips v. Mercer*, 94 Nev. 279, 282, 579 P.2d 174,

17  176 (1978).

18      When a contract is unambiguous, the court must construe the contract from the

19  language used by the parties, not from extrinsic evidence.  *Chwialkowski v. Sachs,* 108

20  _____

21  [10]    These Conclusions of Law incorporate any legal conclusions stated in the
    foregoing Findings of Fact.

22

23  [11]    The Settlement contains mutual releases between Semas and the Meilings, and
    their respective business entities.  Transcript of Settlement, p. 8, lines 11-24.  Exs. 213
24  and 503.  In ruling on pretrial motions, this court determined that the effective date of the
    mutual releases is March 11, 2015.  (ECF No. 411, p. 7, lines 7-10.)  On Chemeon's
25  motion for reconsideration, the court again confirmed that the effective date of the
    mutual releases is March 11, 2015.  (ECF No. 425.)  This court also determined that
26  several claims asserted in the original Complaint, First Amended Complaint, Second
    Amended Complaint, and Third Amended Complaint were barred by the Settlement's
27  release provision and further reiterates that March 11, 2015 is the release date per the
    Release Provision of the Settlement Agreement.

28

1  Nev. 404, 406, 834 P.2d 405, 406 (1992).   A contract is unambiguous if it is not

2  susceptible to more than one interpretation. *See Margrave v. Dermody Properties*, *Inc.*,

3  110 Nev. 824, 827, 878 P.2d 291, 293 (1994).

4  In ruling on Defendants' partial motion for summary on the counterclaim for

5  breach of contract, Judge Du expressly held that, despite the language in the Settlement

6  Agreement, pursuant to *Steppenwolf*, there could not be an absolute ban on the use of

7  the word "Metalast" in any context whatsoever.   (ECF No. 233.)   Rather, Judge Du

8  determined that an issue of fact existed as to whether the way Chemeon and the

9  Meilings used "formerly Metalast" after the 90-day transition period would fit within the

10  terms of the Settlement Agreement.   (*See id.*)[12]   Thus, the court must determine whether

11  the use of the word "Metalast" fit within the terms of the Settlement Agreement.

12  The Settlement Agreement provides that, following a 90-day period, the Meilings

13  and their business entity, Chemeon "will no longer be able to use the name Metalast in

14  any fashion or manner whatsoever."   *See* Ex. 503, page 6, lines 2-11. The court finds

15  that the parties' agreement was clearly directed at precluding the use of the term

16  "Metalast" to market, sell and advertise products and to use the "Metalast" marks *in*

17  *commerce* after June 15, 2015.   This finding is based on the understanding of the ban

18  provision as testified to by Steve Harris, Semas, the various exhibits of correspondence

19  related to the parties' attempts to reduce the Settlement Agreement to a writing, and the

20  subsequent correspondence between Semas, the Meilings, and all the attorneys

21  involved after the Settlement Agreement was formerly entered by the Bankruptcy Court.

22  Although the Meilings testified that they did not understand the terms of the

23  Settlement Agreement, the evidence at trial establishes that before the Bankruptcy Court

24  approved the Settlement, the Meilings and Chemeon were fully aware of the expansive

25  interpretation of that term by all others involved – including Semas and Judge Zive.

26

27  [12]   Having received this case on consent after this decision was entered, the
undersigned made clear on numerous occasions that she would not revisit or overrule
28  prior orders in this case.   (*See* ECF Nos. 510 at 16-17; 537 at 124.)   Thus, the court
conducts its analysis pursuant to those prior rulings.

1    Specifically, they knew that the Settlement precluded Chemeon from using "Metalast" in

2    any fashion or manner whatsoever as it related to use in commerce, such as on its

3    product labels, and/or other in the selling or marketing of its business or products.  This

4    knowledge is underscored by the fact that they complained to the settlement judge that

5    the terms were onerous and would prevent Chemeon from selling products that complied

6    with QPL/QPD, Mil-Spec, or industry contractor specifications.  Exs. 505, 506, 507, 509,

7    510.   Thus,  the Meilings' post-Settlement Conference conduct establishes that they

8    understood that the contract called for an "absolute prohibition" on the use of "Metalast"

9    from the end of the 90-day period after Bankruptcy Court approval of the Settlement

10   when they used the name in commerce, on its product labels, and in other selling or

11   marketing of its business and products.

12         Despite this, Chemeon and the Meilings proceeded to utilize the term "Metalast"

13   in direct contravention to the ban provision after June 15, 2015. Chemeon and the

14   Meilings used this term on product labels, technical data sheets, safety sheets, business

15   correspondence  and  documents  and  in  a  variety  of  other  means  in  commerce.

16   Therefore, this court finds that the way Chemeon utilized the term "formerly Metalast" or

17   "formerly  known  as  Metalast"  as  evidenced  at  the  trial,  breached  the  terms  of  the

18   Settlement Agreement.

19         Based on this finding, the court must next determine whether any defenses apply.

20                  **1.**    ***"Fair Use" Defense (Steppenwolf)***

21         In an order on a motion for reconsideration, Judge Du reiterated that her prior

22   order "identified an affirmative defense available to Chemeon—specifically, the defense

23   that despite its use of the word "Metalast" in the marketplace, such use does not cause

24   confusion because it is accurate and/or historical and thus such use does not amount to

25   a breach of the Settlement Agreement."  (ECF No. 425 at 5.)  As such, the court must

26   next consider Chemeon's fair use defense and the application of *Steppenwolf* based on

27   this prior ruling to the manner in which Chemeon and the Meilings used this term.

28

1    Having considered the evidence at trial and Chemeon's arguments, the court

2    rejects Chemeon's fair use defense. First, the court finds that the way Chemeon used

3    "formerly Metalast" is distinguishable from the facts of *Steppenwolf*. In addition, the court

4    explicitly disagrees with Chemeon that their use of these terms was limited to accurate

5    historical information, as in *Steppenwolf*, or was necessary as a matter of public policy

6    for the reasons explained below.

7    In *Steppenwolf*, 236 F.3d at 489, the agreement at issue provided for Kassbaum,

8    a former member of the band Steppenwolf, and others to "waive, relinquish and release

9    any and all of their individual or collective rights in the name "STEPPENWOLF" or any

10   other word or phrase incorporating the name "STEPPENWOLF" for any purpose

11   whatsoever." The agreement further required Kassbaum to give up any "trademark,

12   trade name, service mark, or service name rights . . . in the name "STEPPENWOLF." *Id.*

13   The court first discussed the history relating to the parties' dispute as to the ownership

14   and control over the use of the trademark in the name Steppenwolf. *Id.* at 491-92. The

15   court found that "[u]nder these circumstances, it is clear that the contract's broad

16   language 'for any purposes whatsoever,' and 'all other uses of the name

17   'STEPPENWOLF' in the entertainment industry' refers to the use of the *trade name*

18   Steppenwolf, and not to the simple use of the name to provide accurate historical

19   information that would not lead reasonable people to think Kassbaum's new band was

20   Steppenwolf." *Id.* at 492 (emphasis in original). As the court observed, "[t]aken out of

21   context, the language 'name STEPPENWOLF' and "'or any purposes whatsoever' might

22   be read so broadly as to preclude Kassbaum from writing 'Steppenwolf' on the sidewalk

23   in chalk." *Id.* at 491.

24   While the Settlement Agreement may not be deemed an "absolute ban" the court

25   finds that the "ban provision" did ban Chemeon from utilizing the name *in commerce*,

26   which is exactly how it has been used by Chemeon throughout the entirety of the case.

27   In *Steppenwolf*, 236 F.3d at 492, the Court found Kassbaum could use "Steppenwolf" to

28   provide accurate historical information that would not lead reasonable people to think

Kassbaum's new band was Steppenwolf.  Thus, Chemeon is free to write the word "Metalast" in chalk on a sidewalk or inform investors or lenders that it acquired certain assets from MI-LLC.  But Chemeon's use was not merely writing words in chalk on a sidewalk—Chemeon's use far exceeded an accurate historical context.  Chemeon utilized the term "Metalast" or "formerly Metalast" *in commerce* when it appeared on or in press releases, advertisements, business communications such as letters and emails, and commercial forms such as shipping labels, technical data sheets, and safety data sheets.  Chemeon's reference to itself as "formerly Metalast" would lead reasonable people to think Chemeon was *the company* formerly known as Metalast, which is clearly an impermissible use of the name and in contradiction to *Steppenwolf*.[13]

Thus, Chemeon's use of the phrase "formerly Metalast" was not a fair use of this term because it plainly violated the terms of the Settlement Agreement and implied that the company "Metalast" ceased to exist or was subsumed by Chemeon. Moreover, Chemeon's use of "formerly Metalast" was not limited to historical references, and in fact, was not historically accurate in several respects based on the evidence presented at trial. Therefore, the court rejects this defense.

## 2.    *The OSHA Regulatory Defense*

Next, Chemeon asserts that it is legally required to call itself "formerly Metalast" and its products "formerly Metalast" in its technical data sheets and safety data sheets (e.g., Exs. 540-592).  For this principle, Chemeon cites 29 CFR § 1910.1200 ("Hazard Communication"), a regulation enforced by the Occupational Safety and Health Administration (the "OSHA Regulation").  29 CFR § 1910.1200(g) mandates safety data

---

[13]    It is critical to note that *Steppenwolf* separately applies trademark law and contract law.  Although Semas's counterclaim (ECF No. 50) and amended counterclaim (ECF No. 51) asserted claims for trademark infringement, those claims were dismissed with prejudice by stipulation (ECF No. 181) and order (ECF No. 199).  Therefore, the court does not enter any conclusions of law with respect to the trademark analysis in *Steppenwolf.*  Specifically, under *Steppenwolf*, "marketplace confusion" is a concept that is relevant to trademark law but is irrelevant to contract law.

sheets ("SDS") and specifies the contents of the SDSs.  Subsection (g)(2) specifies the contents of the SDS.  Subsection (g)(2)(i) requires "identification" of the substance.  Appendix D to the OSHA Regulation specifies that each SDS shall include under "identification" the following: (a) Product identifier used on the label; (b) Other means of identification; (c) Recommended use of the chemical and restrictions on use; (d) Name, address, and telephone number of the chemical manufacturer, importer, or other responsible party; and (e) Emergency phone number.  Nothing in the text of the OSHA Regulation -- including Appendix D mandates that Chemeon identify itself or its products as "formerly Metalast."

Chemeon has not cited any judicial or regulatory ruling that mandates that Chemeon refer to itself or its products as "formerly Metalast."  Chemeon has offered no evidence of any guidance from OSHA to Chemeon advising that its SDS must include "formerly Metalast" in the identification of its products.

Before trial, Chemeon cited a document called OSHA Brief, "Hazard Communication Standard: Safety Data Sheets."  (*See* ECF No. 516-1.)  The OSHA Brief states that a Safety Data Sheet ("SDS") Section 1:  Identification must contain (among other things):

> Product identifier used on the label and any other common names or synonyms by which the substance is known.

Chemeon did not offer the OSHA Brief as evidence at trial.  When Chemeon referred to the OSHA Brief before trial, Chemeon did not authenticate or otherwise lay an evidentiary foundation for the document.  Chemeon did not request judicial notice of the OSHA Brief and offered no foundation for the court to take judicial notice of the document.  Accordingly, the court may not properly regard the OSHA Brief as an authoritative interpretation of the OSHA Regulation, including Appendix D.

Even assuming that the OSHA Brief can be regarded as an authoritative interpretation of the OSHA Regulation, Chemeon offered no evidence that "formerly

1
2
3
4
5
6
7

Metalast" is a "common name" or "synonym" for any of its products.  Further, Chemeon's own conduct is inconsistent with its argument that each SDS must identify the chemical substance by every name under which the substance is known.  For example, AA-200 is sold by at least two distributors under product names that are not disclosed on Ex. 547.  The cleaners, deox, etch, seal, and other products are similarly purchased from suppliers and re-labeled by Chemeon, but Chemeon does not identify the other brand names or product names for those chemicals.  *See* Exs. 548-592.

8
9
10
11
12
13

Even assuming Chemeon should or must "identify" its products as "formerly Metalast" because, before 2015, the products were called "Metalast," Chemeon could have licensed the use of "Metalast" for that purpose from Semas.  Chemeon has cited no statute, regulation, or judicial authority for the proposition that it is free to use any common name or synonym to identify its products in an SDS.  Therefore, the court also rejects this defense.

14

### B.    Defendants' Counterclaim 2 – Duty of Good Faith and Fair Dealing

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *A.C. Shaw Constr. v. Washoe County*, 105 Nev. 913, 914, 784 P.2d 9 (1989) (quoting Restatement (Second) of Contracts § 205). "The implied covenants of good faith and fair dealing impose a burden that require each party to a contract to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1251 (D. Nev. 2016) (quotation omitted).  Where one party to a contract "deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels v. Butch Lewis Productions*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991) ("*Butch Lewis*").  The implied covenant of good faith and fair dealing "essentially forbids arbitrary, unfair acts by one party that disadvantage the other."  *Frantz v. Johnson*, 116 Nev. 455, 465, n. 4, 999 P.2d 351, 358, n. 4 (2000) *citing Consolidated Generator v. Cummins Engine*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998); *Overhead Door Co. v.*

*Overhead Door Corp.*, 103 Nev. 126, 128, 734 P.2d 1233, 1235 (1987).  *See also Department of Transportation v. District Court*, 133 Nev. 549, 555, 402 P.3d 677, 683 (2017).

The duty of good faith and fair dealing imposed by Nevada law provides that even when a party complies "literally" with the terms of a contract, if they purposely breach "the intention and spirit of the contract" they can incur liability for a violation of the covenant of good faith and fair dealing. *See Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991).  Although such a duty is imposed by operation of law, it remains that an inquiry of good faith is a determination of fact. *A.C. Shaw Const., Inc. v. Washoe County*, 105 Nev. 913, 916, 784 P.2d 9, 11 (1989).

The court finds that Chemeon and the Meilings breached the terms of the Settlement Agreement by using the term "Metalast" and "formerly Metalast" in commerce, as discussed above.  However, the court finds that the Meilings relied on the advice of their counsel when they breached the contract.

The Meilings testified as follows: Robert Ryan, who was the intellectual property attorney for Chemeon and the Meilings was available by phone during the Settlement Conference.  Despite placing the material terms of the Settlement Agreement on the record, the Meilings testified that, at the time of the Settlement Conference, they believed the provision barring the use of the term "Metalast" only extended to such things as letter head, business signs, and the like.  At this point, the Meilings and Chemeon had an opportunity to oppose judicial approval of the Settlement.  The Meilings filed a response opposing approval of the Settlement.  In that document, the Meilings stated that they "opposed the settlement because there is no common understanding of agreement reached at the mediation." Moreover, in their response opposing approval of the Settlement, Chemeon and the Meilings argued they should be permitted to use the term "formerly Metalast" as a historical reference, pursuant to the holding in *Steppenwolf*.  In February of 2015, the Meilings obtained new bankruptcy

counsel, Timothy Lukas. Before the hearing on Semas's Motion to Approve Settlement, the Meilings filed a formal pleading withdrawing their opposition to the Settlement Agreement, on the advice of counsel. The Meilings and Chemeon never demanded rescission of the Settlement before or after the Bankruptcy Court approved the Settlement. The Meilings and Chemeon never offered to restore the *status quo ante*. The Meilings testified that the above actions were taken based on advice given to them by their counsel that a different course of action could be taken. They believed, based on this advice, that their course of conduct was permissible.

The court finds that the Meilings are credible on these points and the evidence adduced at trial establishes that the Meilings would not have taken this course of action had they not been relying on the advice of counsel.

Thus, the question becomes whether the court can look to their reliance on their counsel's advice in determining whether they breached the implied convenient of good faith and fair dealing. There is no Nevada law directly on point. However, in a review of case law from other jurisdictions, the court finds that it can, and should, consider these facts in making its factual determination.

*Rea v. Wichita Mortgage Corp.* is illustrative on the varied application of the reliance on counsel aids the court's analysis. 747 F.2d 567, 576 (10th Cir. 1984). In *Rea* found that insofar as good faith is defined in objective terms, reliance is not an absolute defense, but may be a consideration when determining a defendant's good faith, willfulness, or their illegal intent. *Id.*: s*ee In re Taylor*, 655 F.3d 274, 284 (3d Cir. 2011) (in bankruptcy proceeding, holding clients' reliance on counsel precluded finding of bad faith). Reliance on counsel is applicable in many areas of law for a factual determination of bad faith. *See e.g., United States v. Conforte*, 624 F.2d 869, 876 (9th Cir. 1980) (criminal prosecution for tax evasion); J.*J. Newberry Co. v. NLRB*, 645 F.2d 148, 152 (2d Cir. 1981) (unfair labor practice violation); *Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir. 1977) (tort suit against bankruptcy trustee for negligence and misconduct).

This court therefore finds that while Chemeon and the Meilings breached the Settlement Agreement, but they did not do so in bad faith. Rather, their actions were based upon the advice of counsel and the court finds in favor of Chemeon and the Meilings on this claim.

**C.   Defendants' Counterclaim 7 – Specific Performance**

Finally, Semas seeks specific performance of the Settlement prohibition against the Meilings' use of Metalast "in any fashion or manner whatsoever."   "[S]pecific performance of a contract duty will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of the duty."  Restatement (Second) of Contracts, § 357.  The Nevada Supreme Court said,

> Equity regards as done what in good conscience ought to be done. [ ] Specific performance is available when the terms of the contract are definite and certain, [ ] the remedy at law is inadequate, [ ] the plaintiff has tendered performance, [ ] and the court is willing to order it. [ ]

*Carcione v. Clark*, 96 Nev. 808, 811, 618 P.2d 346, 348 (1980) (citations omitted).  *See also Serpa v. Darling*, 107 Nev. 299, 304, 810 P.2d 778, 782 (1991).  Thus, a request for specific performance is addressed to the court's sound discretion. *Id.*, citing *McCann v. Paul*, 90 Nev. 102, 103-104, 520 P.2d 610, 611 (1974).

To grant specific performance, the court need not find that the agreement is certain beyond doubt:

> As this suit in equity is an affirmative proceeding to procure the performance of obligations, a clear and precise understanding of the terms of the contract is normally required. [ ] The contract must be reasonably certain as to its subject matter, its stipulations, its purposes, its parties and the circumstances under which it was made.

*Harmon v. Tanner Motor Tours of Nevada, Limited*, 79 Nev. 4, 17, 377 P.2d 622, 629 (1963) ("*Harmon*").  In the Settlement, the parties agreed:

> [Chemeon] through the Meilings, will continue to use the [disputed Metalast] mark for 90 days following entry of the order approving the settlement agreement by Judge Beesley, if he does approve it.  At the end of that 90-day period, [Chemeon], the Meilings, and any other entity in which the Meilings have an interest, will no longer be able to use the name Metalast in any fashion or manner whatsoever.  Following that 90 days, the

mark will be owned by Mr. and Mrs. Semas, or any entity in which they choose to transfer that mark.

Ex. 503, page 6, lines 2-11.   Although Chemeon has complained about the consequences of that promise, Chemeon has never argued that the provision is indefinite or unclear.  Before the Bankruptcy Court approved the Settlement, the Meilings filed briefs and declarations indicating that the language used is clear and unambiguous, but that they did not appreciate the words used on the day of the Settlement Conference.  Exs. 505, 506, 507, 509.  Because that language was definite and clear, the Meilings' counsel requested that the settlement judge set aside the deal and reopen the negotiation. Ex. 510. The Meilings specifically requested that the Bankruptcy Court modify the promise to specifically allow the use of "formerly Metalast" to identify Chemeon and Chemeon's products, and then withdrew the request.  Ex. 505.  When this court requested that the Bankruptcy Court provide its interpretation of the Settlement, Judge Beesley said that the language is an "absolute prohibition" on the Meilings' use of "Metalast."  Judge Beesley said, "There's no qualification to that, it's everything."  Ex. 514 (ECF No. 89, p. 4).  This court independently finds that the promise not to "use the name Metalast in any fashion or manner whatsoever" is definite and certain.

When the Meilings first opposed approval of the Settlement, they argued that enforcement of the terms would create a hardship to Chemeon's business.  Exs. 505, 506, 507, 509, 510.  Foreseeable hardship is not a defense to specific performance. *Stoltz v. Grimm*, 100 Nev. 529, 532-33, 689 P.2d 927, 929 (1984).

In *Dynalectric Co. of Nevada, Inc. v. Clark & Sullivan Constructors, Inc.*, 127 Nev. 480, 255 P.3d 286 (2011) the court adopted this Restatement:

§ 359 Effect of Adequacy of Damages

(1) Specific performance or an injunction will not be ordered if damages would be adequate to protect the expectation interest of the injured party.

(2) The adequacy of the damage remedy for failure to render one part of the performance due does not preclude specific performance or injunction as to the contract as a whole.

(3) Specific performance or an injunction will not be refused merely because there is a remedy for breach other than damages, but such a remedy may be considered in exercising discretion under the rule stated in § 357.

*Dynalectric*, at 484, n. 7, 255 P.2d at 289, n. 7, citing Restatement (Second) of Contracts, § 359.

"To destroy one's property is sometimes regarded as an irreparable injury...." *Czipott v. Fleigh*, 87 Nev. 496, 499, 489 P.2d 681, 683 (1971) ("*Czipott*").  Semas had a contract right to exclude the Meilings from using the Metalast brand in commerce. Because the Meilings and Chemeon used the Metalast name in the chemical business, Semas was unable to sell, license, or otherwise monetize the brand.  Although it is <u>theoretically</u> possible to prove resulting damages, it would be difficult to prove the quantum of damages suffered.  *See Harmon*, at 17, 377 P.2d at 629 (1963) ("The inability of any court to make an appropriate damage award for breach of contract, had Tanner requested same, is evident.")  Even where proof of damage is theoretically possible, courts should grant equitable relief when "the equitable remedy is so far superior that the legal remedy is rendered inadequate." *Czipott*, at 499, 489 P.2d at 683.

Restatement (Second) of Contracts § 360 provides:

In determining whether the remedy in damages would be adequate, the following circumstances are significant:

(a) the difficulty of proving damages with reasonable certainty,

(b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and

(c) the likelihood that an award of damages could not be collected.

In this case, it would be difficult or impossible for Semas to prove damages from the Meilings' breach of the Settlement with any certainty.  Furthermore, a suitable "substitute performance by means of money awarded as damages" would effectively require that the court impose a licensing scheme upon Chemeon to continue using the Metalast name.  In doing so, the court would be modifying the Settlement itself to require payment of past and future licensing fees to replace the promise that enjoins conduct.  Therefore,

1   under section 360, the court concludes that damages for past or future breaches of the

2   Settlement is not an adequate legal remedy.

3       "An order of specific performance or an injunction will be so drawn as best to

4   effectuate the purposes for which the contract was made and on such terms as justice

5   requires. It need not be absolute in form and the performance that it requires need not

6   be identical with that due under the contract."   Restatement (Second) of Contracts, §

7   358.

8               **1.    *Unclean Hands Defense***

9       Chemeon and the Meilings insist that the court should not order specific

10  performance of the Settlement because Semas is guilty of unclean hands.   "Specific

11  performance or an injunction may be granted in spite of a breach by the party seeking

12  relief, unless the breach is serious enough to discharge the other party's remaining

13  duties of performance."   Restatement (Second) of Contracts, § 369.   Chemeon and the

14  Meilings have not claimed that Semas breached the Settlement in any way.

15      The District Court previously said,

16          To determine whether unclean hands bars equitable relief, a court
        must consider "(1) the egregiousness of the misconduct at issue, and (2)
17      the seriousness of the harm caused by the misconduct." *Las Vegas Fetish
        & Fantasy Halloween Ball, Inc., v. Ahern Rentals, Inc.*, 124 Nev. 272, 182
18      P.3d 764, 767 (2008). Moreover, the alleged inequitable conduct must be
        connected with the matter in the litigation "otherwise the doctrine is not
19      available as a defense." *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 124
        Nev. 629, 189 P.3d 656, 662 (2008).
20

21          Semas argues that with his specific performance claim he "is trying
        to enforce the settlement agreement, to obtain what he bargained for in
22      exchange for agreeing to pay certain claims and releasing others" and that
        "none of the conduct alleged in [Plaintiff's Motion] has anything to do with
23      the formation or enforcement of the settlement agreement." (ECF No. 326
        at 30.) Chemeon contends that because Semas negotiated for ownership
24      of the wordmark as part of the Settlement, his hands are unclean with
        respect to that mark. (ECF No. 343 at 22.) The Court disagrees—it is
25      possible that Semas' hands were "clean" at the time he negotiated the
        Settlement and the ownership of the wordmark and then became "unclean"
26      when he renewed the wordmark's registration many months later. The two
        are unrelated and the theory of unclean hands as advanced in Plaintiff's
27

28

                                    33

Motion is unavailing. The Court therefore denies summary judgment in favor of Chemeon on this counterclaim.

*Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 964 (D. Nev. 2018).  Although this decision disposes of a summary judgment motion, the principles nevertheless apply to the trial evidence.  Specifically, Chemeon argues that Semas was guilty of inequitable conduct in the manner that he obtained the Metalast trademarks in the first place, so that the enforcement of the Settlement confirming that Semas owns the Metalast marks would be inequitable.  The court rejects this argument.

First, Chemeon's position, if accepted, would subvert the very purpose of a settlement:  if settling parties resolve a dispute over ownership of property -- in this case intangible property -- they should not be able to ignore their bargain by pointing to pre-Settlement conduct that bears upon the very thing that was resolved in the Settlement itself.

Further, when Chemeon and the Meilings entered into the Settlement Agreement, they were releasing all claims known and unknown up until that point.  At the time of the Settlement in the Bankruptcy Court, they bargained for and released all claims to the rights in the Metalast name and were given time to set their affairs in order regarding the use of Metalast—90 days—whereupon they were to cease its use. This never happened, and therefore Chemeon has never complied with the provisions of the Settlement Agreement. For Chemeon to assert an unclean hands defense in a request to the court to not grant injunctive relief to Semas and MI-INC, is in effect a backdoor request of asking the court for a reformation of the provisions of the Agreement they find onerous.

"Courts view settlement agreements as the final disposition on matters and will not adjudicate issues that have already been resolved." *Jardin v. Datallegro, Inc.*, 2009 WL 186194, at *5 (S.D. Cal. Jan. 20, 2009) (citing *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1343 (9th Cir. 1992)). Claims that fall into the scope of what was released should be dismissed. *See, e.g., Promex, LLC v. Hernandez*, 781 F. Supp. 2d 1013,

1016-17 (C.D. Cal. 2011) (dismissing infringement claims that were mutually released

prior to the lawsuit).

    Chemeon agreed to the terms in the Settlement. *Promex*, provides that a

plaintiff's claim should be dismissed if they fall within the scope of the previous

settlement. Such a bar would apply to Semas if they were to assert such a claim.

Accordingly, it would stand to reason that the inverse would be true for Chemeon to be

barred from asserting a defense predicated on conduct arising from previously

adjudicated claims. Chemeon cannot assert Semas's actions are improper when it was

agreed in the Settlement that Chemeon would relinquish all rights in that mark. *See*

*Rescap Liquidating Tr. v. First California Mortg. Co.*, 2019 WL 402318, at \*8 (N.D. Cal.

Jan. 31, 2019) (striking unclean hands defense, among other affirmative defenses,

based on defendant's rejected interpretation of settlement agreements release

provision).

    Moreover, the court also rejects Chemeon's argument that Semas fraudulently

obtained ownership of the Metalast word mark and logo marks because it is not

supported by the evidence or the facts. Chemeon's assertions are based upon the claim

that the License Agreement between MI-INC and MI-LLC did not actually exist in 1996 –

but was later created by Semas. However, there is no evidence to support this theory.

    To the contrary, Semas testified that the License Agreement was entered in 1996

between MI-INC and MI-LLC. Semas's testimony is corroborated by other evidence.

Specifically, in 1995, Semas filed the first applications for registration of the word mark

and logo marks.  On those applications, the registered owner was listed as MI-INC.  Ex.

323.  In 1996, USPTO granted these applications and issued the registrations explicitly

listing MI-INC as the registered owner of the marks.  Ex. 323. Between 1996 and 2011,

Semas filed several subsequent applications for registration of these trademarks and

each application listed the registered owner as MI-INC.  Ex. 323.  Moreover, in each of

the subsequently issued registrations from the USPTO, MI-INC was again explicitly listed

as the registered owner.  Ex. 323. In addition, MI-INC's ownership of the mark was

1   further corroborated through regular MI-LLC communications to its members, which

2   further corroborates the existence of the License Agreement long before Semas filed for

3   bankruptcy.  Exs. 628-629.  The court finds Semas's testimony on this point credible.

4       The court further notes that long before this litigation, Chemeon's principal owner

5   subjectively knew that the marks were registered to MI-INC, not MI-LLC.  Ex. 285.  In

6   2014, Chemeon filed pleadings in the Bankruptcy Court complaining that Semas had

7   fraudulently obtained ownership of the marks.  Exs. 501 and 502.  Chemeon then

8   entered the Settlement (Ex. 503) which confirmed that Semas owned the trademarks.

9   Public records maintained by the USPTO, as described above, demonstrated that the

10  marks were always registered in the name of MI-INC (Semas's entity) and not MI-LLC.

11  Thus, for all these reasons, the court rejects Chemeon's unclean hands defense.

12      **D.**      **Plaintiff's Claim 2 – Declaratory Judgment of No Infringement**

13      **(Attorney's Fees as Extraordinary Circumstance)**

14      "The court in exceptional cases ***may*** award reasonable attorney fees to the

15  prevailing party."   Lanham Act § 47(a), 15 U.S.C. § 1117(a) (emphasis added).

16  Chemeon claims Semas's conduct makes this case "exceptional" and justifies an award

17  of attorney fees to Chemeon.  This court must exercise discretion and consider the

18  totality of circumstances.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S.

19  545, 554 (2014). To support its claim under the "exceptional case" provision, Chemeon

20  has asserted that Semas defrauded investors, the Securities and Exchange

21  Commission, the Internal Revenue Service, and the USPTO.  The court will consider

22  only Semas's conduct with respect to trademark issues because the authority for

23  "exceptional case" fees exists in the Lanham Act, which does not reach non-trademark

24  claims.

25      As stated above, the court rejects Chemeon's argument that Semas fraudulently

26  obtained ownership of the Metalast word mark and logo marks.  Thus, the court does not

27  find that Chemeon is entitled to "exceptional case" fees to relitigate the claims raised

28  before and compromised in the Settlement.  Semas sued Chemeon for trademark

infringement in his counterclaim.  (ECF No. 50 (September 8, 2015).)  Semas stipulated to the dismissal of those claims.  (ECF No. 181 (September 21, 2016).)  The court accepted that stipulation.  (ECF No. 199 (November 1, 2016).)  Nothing in the stipulation suggests that Chemeon has reserved the right to seek attorney fees to defend against those trademark claims.  Chemeon has offered no evidence or analysis to show that those dismissed trademark claims were frivolous or otherwise "exceptional." Therefore, the court finds that this case is not "exceptional" and attorneys' fees will not be awarded pursuant to 15 U.S.C. § 1117(a).

### E.    Plaintiff's Claim 5 – Common Law Trademark Infringement

Chemeon seeks a permanent injunction to prevent Semas from ever using two unregistered (or common law) product marks "TCP-HF" and "AA-200."  To prevail on a claim for injunctive relief pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Chemeon must demonstrate "(1) that it is the prior owner of the trade name or service mark, and (2) that defendant adopted a trade name and service mark that is the same or confusingly similar to plaintiff's trade name or service mark so that there exists a likelihood of confusion to consumers as to the proper origin of the goods or services, such that a consumer is likely to believe that defendant's goods or services are being sold with the consent or authorization of the plaintiff, or that defendant is affiliated with or connected to the plaintiff." *American United Life Insurance Company v. American United Insurance Company*, 731 F. Supp. 480, 485 (S.D. Fla. 1990).

Chemeon cannot own the "TCP-HF" and "AA-200" sub-marks.  Before the Settlement, MI-LLC and Chemeon sold "Metalast TCP-HF" and "Metalast AA-200."  No products were labeled or advertised for sale as "TCP-HF" or "AA-200" without the preceding "Metalast."

Lanham Act § 43(a) applies to both registered and unregistered trademarks, and specifies civil liability:

> (1)    Any person who, on or in connection with any goods or services, or any container for goods, ***uses in commerce*** any word, term, name, symbol, or device, or any combination thereof, or any false designation of

origin, false or misleading description of fact, or false or misleading representation of fact, which ...

15 U.S.C. § 1125(a) (emphasis added).  Assuming Chemeon owns the "TCP-HF" and "AA-200" sub-marks, there was no evidence that Semas ever used these sub-marks ***in commerce***.  As evidence of an infringement (or threatened infringement) of the two sub-marks, Chemeon points to Semas's emails offering to sell or license the Metalast brand to companies in the chemical business.  Exs. 219, 220.  Before trial, the court considered the same evidence as part of summary judgment practice, and concluded,

> None of these things implicated Semas' or his related entities' false use or misrepresentation of items owned by Chemeon *in commerce*; Semas was not attempting to market or sell a good when making statements during the course of litigation...

(Amended Order, ECF No. 411, pp. 11-12 (italics in original).)  Likewise, Chemeon offered no trial evidence that Semas ever labeled, advertised, or offered to sell any products as "TCP-HF" or "AA-200."  There is no evidence that Semas has used those sub-marks *in commerce.*

Assuming that "TCP-HF" and "AA-200" are protected marks at all, Chemeon did not establish the elements required for a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006).  To obtain a permanent injunction in a trademark action, the plaintiff must prove <u>actual</u> irreparable harm will occur.  *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  If the defendant has infringed on a trademark but has ceased the offending activity and there is no indication of inclination to repeat the offense, the trademark plaintiff is not entitled to a

1   permanent injunction.  *Larry Pitt & Associates v. Lundy Law, LLP,* 294 F. Supp. 3d 329,

2   343 (E.D.Pa. 2018).  Here, there is no evidence that Semas ever infringed on the "TCP-

3   HF" or "AA-200" claimed marks in the past.  Further, there is no evidence that he has

4   threatened to do so in the future. The court finds for Semas on this claim.

5           **F.      Plaintiff's Claim 6 – Copyright Infringement**

6           Chemeon claims that Semas infringed on Chemeon's copyright in two works, the

7   2003 ICP Job Pro Web Page Advertisement ("2003 Work") and the 2004 Product Label

8   ("2004 Work").

9           A plaintiff cannot file an action for copyright infringement until the Copyright Office

10  has issued a Certificate of Registration for the work.  17 U.S.C. § 411(a); *Fourth Estate*

11  *Public Benefit Corporation v. Wall-Street.com, LLC*, -- U.S. --, 139 S.Ct. 881, 885, 203

12  L.Ed.2d 147 (March 4, 2019).  Chemeon initially added claims for infringement of the

13  Copyright Works in its Second Amended Complaint (ECF No. 348, November 1, 2017),

14  before the Copyright Office issued Certificates of Registration for the 2003 Work and

15  2004 Work.  Under *Fourth Estate*, the Second Amended Complaint was premature as to

16  the claims for infringement of the Copyright Works.

17          Chemeon filed a Third Amended Complaint (ECF No. 535, October 31, 2019) to

18  restate its claims for infringement of the Copyright Works.  Chemeon has not

19  demonstrated that the Copyright Office issued Certificates of Registration prior to that

20  filing, but Semas has not disputed that that the Third Amended Complaint was

21  premature under *Fourth Estate.*  However, under the three-year statute of limitations in

22  17 U.S.C. § 507(b), the Third Amended Complaint can only reach back three years prior

23  to the date of the complaint to address, in this case, infringements occurring after

24  November 1, 2016.  *Roley v. New World Pictures, Ltd.* 19 F.3d 479, 481 (9th Cir. 1994).

25  Chemeon offered no evidence that Semas infringed on the 2003 Work or 2004 Work

26  within this three-year "look back" period.

27          Chemeon alleges that Semas infringed on the Copyright Works by including them

28  as exemplars in support of a June 21, 2015 application to renew the Metalast word mark.

1    Ex. 245.   To look back to that alleged infringement, Chemeon claims that its Third

2    Amended Complaint relates back to its Second Amended Complaint, which was filed

3    within three years after the alleged infringement.   However, because the Second

4    Amended Complaint was premature under *Fourth Estate*, allowing relation-back to the

5    Second Amended Complaint would subvert the principle of *Fourth Estate*.   The court

6    adopts the following reasoning:

> First, with respect to relation-back, Plaintiff's argument would make a
> meaningless formality out of *Fourth Estate's* requirement that an
> application be approved prior to filing suit. Were it correct, a plaintiff could
> file suit at any time, notwithstanding Section 411(a)'s precondition, and
> simply update the complaint when registration finally occurred. That would
> undermine Congress's choice to "maintain[ ] registration as prerequisite to
> suit." *Fourth Estate*, 139 S. Ct. at 891. Enforcing Congress's choice means
> that an amended complaint alleging compliance with Section 411(a) cannot
> relate back to a time before that compliance was achieved.

13   *Malibu Media, LLC v. Doe*, 2019 WL 1454317, *2-*3 (S.D.N.Y. April 2, 2019) (internal

14   citations and footnotes omitted).

15       The only way to harmonize 17 U.S.C. § 411(a) and 17 U.S.C. § 507(b) is to

16   require that the copyright owner file the complaint after the issuance of the Certificate of

17   Registration (section 411(a)) but before the expiration of the three-year statute of

18   limitations (section 507(b)).   Chemeon did not bring its action for infringement of the

19   Copyright Works within this window.   Based on this conclusion, Chemeon's claims for

20   copyright infringement are time-barred.

21       The following additional conclusions are independent reasons for a defense

22   judgment on these infringement claims.

23            **1.    *Authorship***

24       On April 20, 2017, Chemeon applied to the Copyright Office for registration of the

25   2003 Work (Ex. 293) and the 2004 Work (Ex. 291).   In each case, Madylon "certified"

26   that MI-LLC was the author or owner of the work, and that Chemeon acquired MI-LLC's

27   ownership rights.   The Copyright Office issued Certificates of Registration for the 2003

28   Work (Ex. 292) and 2004 Work (Ex. 290).   Those Certificates of Registration are

effective as of the application date, March 20, 2017.  17 U.S.C. § 410(d).  However, because Chemeon did not seek registration within five years after the works were created, those Certificates of Registration carry no presumption about the validity of the copyrights, authorship, or ownership.  17 U.S.C. § 410(c).  Chemeon offered no direct evidence to identify the author(s) of the 2003 Work or 2004 Work.  There is some evidence that QualiChem *may* have created an original work of authorship in the product label shown in Exhibit 304.  Chemeon failed to satisfy its burden of proof to establish authorship and ownership of the Copyright Works.

### 2. *Monetary Remedies*

Chemeon offered no evidence of actual damages caused by the alleged infringements.  Chemeon offered no evidence of infringer's profits resulting from the alleged infringements.  Chemeon cannot recover statutory damages or attorney fees because the alleged infringement took place before registration.  17 U.S.C. § 412.  Chemeon offered no evidence of any post-registration infringements.

### 3. *Injunction*

A court may grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  To obtain a permanent injunction for infringement of a copyright, the infringement plaintiff must prove "actual" success on the merits.  *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011).  Chemeon has not won "actual" success on the merits.  Furthermore, Chemeon has offered no evidence that Semas has threatened to copy the Copyright Works in the future.

### 4. *Further Infringement by USPTO Publication*

Chemeon argues that Semas must be compelled to withdraw his June 21, 2015 renewal application so that the Copyright Works are no longer available for public downloads.  Chemeon offered no evidence or citation to statutes, regulations, or judicial precedents for the principle that Semas is responsible for any copies made by the USPTO or the public because the Copyright Works are available for public download.

Further, Chemeon has not addressed why the USPTO's use or reproduction of the Copyright Works is not permitted under 17 U.S.C. § 108 (limitation on exclusive rights: reproduction by libraries and archives). For all the above reasons, the court finds for Semas on this claim.

## VI.   CONCLUSION

**IT IS HEREBY ORDERED** that judgment is granted in favor of Defendants on Plaintiff's claims for relief;

**IT IS FURTHER ORDERED** that judgment is granted in favor of Defendants on Defendants' first and seventh claims for relief;

**IT IS FURTHER ORDERED** that judgment is granted in favor of Plaintiffs on Defendants' second claim for relief;

**IT IS FURTHER ORDERED AND ADJUDGED** as follows:

- Plaintiff's request for a permanent injunction enjoining Semas and his business entities from using "TCP-HF" or "AA-200" is **DENIED**;
- Plaintiff's request for a permanent injunction enjoining Semas and his business entities from infringing on the Copyright Works is **DENIED**;
- Plaintiff's request for a finding that this is an "exceptional case" under Lanham Act § 47(a) is **DENIED**;

**IT IS FURTHER DECREED** that, beginning June 11, 2015, Dean Meiling, Madylon Meiling, and Chemeon had no right to use "Metalast" in commerce, including, but not limited to, calling itself or its products "formerly Metalast" or "formerly known as Metalast";

**IT IS FURTHER DECREED** that Counterclaimants Dean Meiling, Madylon Meiling, and Chemeon are hereby ordered to perform the Settlement by halting all use of "Metalast" on any product labels, advertisements, sales orders, invoices, purchase orders, technical data sheets, safety data sheets, web pages, brochures, or other documents of commerce.  This judgment of specific performance may be enforced by contempt proceedings in this court;

1     **IT IS FURTHER ORDERED** that Chemeon shall have fourteen (14) calendar days

2 after entry of this order within which to respond to Greg Semas's motion for attorney fees

3 and Wendi Semas's motion for attorney fees (ECF Nos. 466, 469);

4     **IT IS FURTHER ORDERED** that Chemeon shall have fourteen (14) calendar days

5 after entry of this order within which to move to retax costs set forth in Wendi Semas's

6 Bill of Costs (ECF No. 467);

7     **IT IS FURTHER ORDERED** that any other party may file a motion for attorney

8 fees or bill of costs within fourteen (14) calendar days after entry of this order; and,

9     **IT IS FURTHER ORDERED** that the Clerk of the Court **ENTER JUDGMENT**

10 accordingly and **CLOSE** this case.

11

12 **DATED**: February 23, 2021

13

14

15 **UNITED STATES MAGISTRATE JUDGE**

16

17

18

19

20

21

22

23

24

25

26

27

28